EQUITABLE SECURITIES COMPANY ET AL. *v.* ANN T. SHEPPARD.

1. PRINCIPAL AND AGENT. *Notice.*

> Notice given to an agent, while acting as such, is notice to the principal.

2. SAME. *Antecedent notice. Evidence.*

> A principal will not be bound by knowledge acquired by an agent before his employment, unless there be clear and satisfactory proof that the antecedent knowledge was present in the agent's mind while acting for the principal.

3. LANDS.   *Innocent purchaser.*

> An innocent purchaser of lands, the title to which was fraudulently
> obtained by his vendor, can convey a good title to one who had
> notice of the fraud.

FROM the chancery court of Bolivar county.

HON. A. McC. KIMBROUGH, Chancellor.

Ann T. Sheppard, the appellee, was the complainant in the
court below; the Equitable Securities Company and another,
the appellants, were defendants there.   From a decree of the
court below in complainant's favor the defendants appealed to
the supreme court.   The facts are stated in the opinion of the
court.

*Miller, Smith & Hirsh,* for appellants.

Mr. Scott acted as the attorney of Mrs. Mason, as adminis-
tratrix of Deason, in procuring the sale in 1883–4, and on the
fifteenth day of May, 1884, the decree confirming the sale was
made by the chancellor, and the deed was dated the sixteenth
day of June, 1884.   Mr. Scott's certificate to the abstract of
title is dated the twenty-first day of January, 1891; and his
final certificate is dated the second day of February, 1891,
nearly seven years after the sale had been made to W. B.
Mason.

While it is true that notice to an agent is notice to the prin-
cipal, this general rule is subject to the following qualifications,
to wit:

1. Notice to an agent, in order to affect the principal, must
have been acquired by the agent during the transaction of the
business for his principal, but, if the agent had prior to this
acquired knowledge, the principal is affected by this knowledge
only if it is present to the agent's mind during the transaction
of his business.   1 Am. & Eng. Enc. L. (2d ed.), 1149, 1150.

2. When it is not the agent's duty to communicate such
knowledge, or when it would be unlawful for him to do so—
as, for example, when it has been acquired confidentially, as

an attorney for a former client in a prior transaction — the reason of the rule ceases, and in such case the agent would not be expected to do that which would involve the betrayal of professional confidence, and his principal ought not to be bound by his agent's secret and confidential information. *Ib.*, 1145.

The case of *The Distilled Spirits*, 11 Wallace (U. S.), 356, is a leading case upon the doctrine of notice. The court will find, on examination, that this case is cited in nearly every decision of every supreme court that has had under consideration since that time the question now discussed. In that case the court says: "So that in England the doctrine seems to be established that, if the agent, at the time of effecting a purchase, has knowledge of any prior lien, trust or fraud affecting the property, no matter when he acquired such knowledge, his principal is affected thereby. If he acquired the knowledge when he effected the purchase, no question can arise as to his having it at that time. If he acquired it previous to the purchase, the presumption that he still retains it, and has it present to his mind, will depend on the lapse of time and other circumstances. Knowledge communicated to the principal himself he is bound to recollect, but he is not bound by knowledge communicated to his agent unless it is present to the agent's mind at the time of effecting the purchase. Clear and satisfactory proof that it was so present seems to be the only restriction required by the English rule as it is now understood." Further along and on page 368 the court gives its adherence to this doctrine.

In the case of *Fairfields Savings Bank* v. *Chase*, 72 Me., 276, s. c. 39 Am. Rep., 319, the court says: "Upon this question the authorities disagree (that is to say, the question of the effect of previous notice to the agent). The negative of the question has been uniformly maintained in Pennsylvania and some of the other states. In the late case of *Houseman* v. *Building Association*, 81 Pa. St., 256, it was said 'that notice to an agent twenty-four hours before the relation commences

is no more notice than twenty-four hours after it has ceased would be.' But we think, all things considered, the safer and better rule to be that the knowledge of the agent obtained prior to his employment as agent, will be implied or imputed notice to the principal under certain limitations and conditions, which are these: The knowledge must be present to the mind of the agent when acting for the principal; so fully in his mind that it could not have been at the time forgotten by him; the knowledge or notice must be of a matter so material to the transaction as to make it the agent's duty to communicate the fact to his principal, and the agent must himself have no personal interest in the matter which would lead him to conceal his knowledge from his principal, but must be at liberty to communicate it."

Later along in this opinion are cited a number of English and American cases, including the *Distilled Spirits case*, 11 Wallace, above cited. To this case there will be found an elaborate note, citing many decisions in England and in this country.

In the case of *Constant* v. *University of Rochester*, 111 N. Y., 604, s.c. 7 Am. St. Rep., 769, the court says: " From all these various cases it will be seen that the furthest that has been gone in the way of holding a principal chargeable with knowledge of facts communicated to his agent, where the notice was not received or the knowledge obtained in the very transaction in question, has been to hold the principal chargeable upon clear proof that the knowledge which the agent once had, and which he had obtained in another transaction and at another time and for another principal, was present to his mind at the very time of the transaction in question. Upon a careful review of the testimony in this case, we have been unable to find any such proof."

The court, in reading this case of *Constant* v. *University of Rochester*, will see that Dean was the attorney for a man by

the name of Constant, and had taken a mortgage to secure a loan for Constant, which mortgage had not been recorded, but was in his (Dean's) office, and that subsequently Dean took a mortgage in favor of the University of Rochester upon the same property, which was recorded prior to Constant's mortgage. The court says as to this: "There is no proof in the case showing that Dean made any pretense of remembering at the time of the execution of the mortgage to the university that eleven months before he had taken a mortgage on the same property for the plaintiff's decedent, which was not recorded. Taking into consideration the enormous amount of business done by Dean for Constant of this same general nature, and the length of time that elapsed since the taking of the Constant mortgage by him, and the fact that it was never taken from the office by the mortgagee, and that it remained there and was found in a pigeon hole appropriated to satisfied mortgages, and that on the very statement in question, upon which the learned judge evidently based his finding, it is alluded to as satisfied, all these facts would tend to show very strongly that Dean had no recollection whatever of the existence of the Constant mortgage as an existing lien at the time he took the mortgage to the university. But the burden is upon the plaintiff to prove, clearly and beyond question, that he did, and it is not upon the defendant to show that he did not have such recollection. And we think that there is a total lack of evidence in the case which would sustain the finding that Dean had the least recollection on the subject at the time of the execution of the university mortgage. Under such circumstances, we think it impossible to impute notice to the university or knowledge in regard to a fact which is not proved to have been possessed by its agent."

In that case only eleven months had elapsed, and the unrecorded mortgage was in Dean's office. In this case nearly seven years had elapsed, and there is not a shadow of proof of any kind to show that any recollection of the Mason sale and purchase was present in Mr. Scott's mind.

*Moore & Clark*, for appellee.

C. T. Mason, having married the administratrix of T. W. Deason, deceased, and executed bond, became co-administrator and was trustee of the estate.    Code of 1871, §§ 1106, 1122.    Marriage with an administratrix confers the same duties upon the husband as are incumbent upon the wife.    *Edmundson* v. *Roberts*, 1 How. (Miss.), 329; *Wren* v. *Gayden*, 1 How. (Miss.), 376; *Wood* v. *Stafford*, 50 Miss., 370.    The record shows conclusively that Mason had been scheming continually from the time of his marriage to obtain the title to the lands left by Deason in himself or for his children.    His correspondence with his attorney (attached to the deposition of Josephine Reuter) shows his bad faith conclusively.    The executor or administrator cannot purchase at his own sale, directly or indirectly, nor make any arrangement with the purchaser whereby the trustee will obtain the benefit to himself, or do anything whatsoever that will conflict with his duties as trustee.    *McGowan* v. *McGowan*, 48 Miss., 553; *Chapman* v. *Sims*, 53 Miss., 154; *Hyde* v. *Warren*, 46 Miss., 13; 2 Jones on Mort., 1886; *Brockett* v. *Richardson*, 61 Miss., 766; *Woods* v. *Stafford*, 50 Miss., 370; *Wooldrige* v. *Campbell*, 61 Miss., 634.

The doctrine is well established that, if the trust estate becomes vested in the original party whose conscience is bound, equity will hold him accountable as trustee, even though he buys from a *bona fide* purchaser without notice.    *Price* v. *Martin*, 46 Miss., 489, and authorities there cited; 1 Story's. Eq. Jur., 401, 409, 410.    This doctrine is as well settled as that the trustee cannot deal for his own benefit.    Therefore, when C. T. Mason repurchased the property from W. B. Mason, it became chargeable in his hands as a trust fund for the heirs, and he was chargeable with it as trustee for them.    The trustee, whether he acts fairly or unfairly, is forbidden to deal with the estate for his own benefit.

The appellants claim that they are entitled to hold the land in dispute because of their own *bona fides* as purchasers without

notice.    We do not deny that a *bona fide* purchaser for value, and without notice, will be protected, notwithstanding the fact that the seller or vendor is dealing in bad faith.    We claim that the record in this case establishes notice to appellants at every stage of the proceeding.    It was given them by the abstract of title upon which they base their loan.    The purchaser of lands is bound by the recitals in the deeds forming the links of his title, and is also bound by notice of everything referred to in the record of any proceeding through which his title traces, and of which he had notice, actual or constructive.    On the face of the abstract of title prepared by the mutual agent, both of the borrower and the lender, being the correspondent of the mortgage company and the attorney and agent for C. T. Mason in negotiating the loan, it is shown that Mason derived title through sales in the settlement of the Deason estate.    This record shows that appellee was the infant child of T. W. Deason, deceased; that C. T. Mason was the husband of the administratrix, and qualified as such; that the sale of the land was made for the purpose of repaying the judgment acquired by C. T. Mason while he was trustee; that W. B. Mason purchased at the sale, and very shortly thereafter reconveyed to C. T. Mason, whose conscience was bound.    *Price* v. *Martin*, 46 Miss., 489; 1 Story's Eq. Jur., 401, 409, and 410..  And his bad faith is shown.

The record shows that appellant's attorney had actual knowledge of the facts connected with the history of this title, and that he had frequently warned C. T. Mason against the purchase of this property, his letters to that effect being incorporated in the record.    Notice, therefore, to the attorney and confidential agent for both parties is conclusively shown by the record.    A continued connection of the attorney with Mason's business is proven until the death of Mason.  It is not conceivable that the attorney could forget the facts so intimately connected with this title.    They must necessarily have been clearly presented to his mind and recollection when he examined the title.

This necessarily binds his client. Am. & Eng. Enc. L. (Agency), 1149. "The notice was acquired during the course of business in which he was employed, and was present to his mind during the transaction of his duties." 11 Wall., U. S., 256; 1 Am. & Eng. Enc. L., 1150, note 2. When the attorney examined the title to this property he was necessarily confronted with all of the facts, and must have had his mind refreshed. *Allen* v. *Pool*, 54 Miss., 323; *Holden* v. *N. Y. Bank*, 72 N. Y., 292; *Constant* v. *University of Rochester*, 2 L. R. A., 734. We particularly call the court's attention to the dissenting opinion in that case. The attorney was the mutual and confidential agent of both parties to the transaction. This was a case where "with full knowledge of the fact that the agent was the common agent of both, each principal employed him," and in such case the doctrine that the agent's notice must be acquired in the same transaction, is less strictly adhered to. 1 Jones on Mort., 588, note; *Edwards* v. *Hillier*, 70 Miss., 803; *Allen* v. *Poole*, 54 Miss., 323; *Cameron* v. *Lewis*, 56 Miss., 601.

We therefore contend that appellants are bound: (1) by actual notice given them by the abstract of title; (2) by knowledge acquired by their agent in the examination of the title; (3) knowledge by the agent, present to his mind at the time of the investigation, though acquired in a former transaction; (4) knowledge of the mutual agent of both parties, who each took the risk of having imputed to him whatever knowledge the agent had on the subject.

The Equitable Mortgage Co. and the Equitable Securities Co. were one and the same. The stockholders were identical in each. The property of one was transferred to the other as a matter of convenience, and the new company with that property paid off the debts of the old corporation; the amount of stock was the same; there was no change except in the name of the corporation. Wait on Insolv. Cor., sec. 435; *Mississippi, etc., Co.* v. *Chicago, etc., R. R. Co.*, 58 Miss., 852. The new company took the land charged with notice, and then sold

to Hurley, who was likewise a purchaser with notice. All the parties to the transaction concerning this title, since the death of T. W. Deason, in 1878, have been continuously represented by the same counsel, who thereby must necessarily have had presented continually to his mind the true history of the title.

Argued orally by *Murray F. Smith*, for appellant, and by *Fred Clark*, for appellee.

CALHOON, J. delivered the opinion of the court.

This is an appeal from a final decree in chancery rendered against the Equitable Sureties Company and the executors of the will of J. L. Hurley, the appellants, on a bill filed by Ann T. Sheppard, answers, and evidence. As briefly as it may be perspicuously put by the writer, the case is this: The complainant, Mrs. Sheppard, is the only child and heir at law of T. W. Deason, who died January 14, 1878, intestate, the owner of the lands in dispute. Mrs. Sheppard's mother, Josephine Deason, who was the widow of the deceased, became the administratrix, and while administratrix the widow, Josephine Deason, intermarried with C. T. Mason on August 11, 1879. Mrs. Sheppard charges in her bill that, immediately on his marriage to her mother, C. T. Mason took sole charge of all the estate of her father, Mr. Deason, and began to scheme to get the title to the lands in his own name; that he rendered only such accounts to the court as he saw fit, and never consulted the administratrix; that he collected all the rents and used them as he pleased, allowing no interference; that he fraudulently obtained a claim of a Mrs. Williams against the estate, and, by collusion with her, obtained a judgment against it in a federal court; that the purchase money of this claim was paid by Mason largely from the rents of the estate lands, and then he forced his wife, the administratrix, to apply for the sale of the lands to pay this debt, by threats and intimidation, and that, by fear of personal harm, she was

deterred from interfering in the proceedings; that she was not at the sale, knew nothing of it, or of the advertisement of it, beforehand, and that she gave no authority to any one to make it, though she signed the report of sale, but not willingly, and because of threats and duress; that W. B. Mason, brother of C. T. Mason, appeared to be the purchaser for $3,000, as reported, but that in fact he was not at the sale, and did not purchase nor pay any part of the purchase price; that the bid was at the suggestion of C. T. Mason, to get the title in his brother, who had agreed to and did reconvey to him; that his first intent was to be the bidder, and take title to himself directly, but he selected his brother as a mere conduit, because of advice of counsel that he could not buy, he being trustee by law, in virtue of his marriage with Mrs. Deason; that she, at first, refused to make the deed as administratrix to W. B. Mason, but afterwards did so from duress and threats and fear of personal violence, and because of "numerous other unlawful means" employed by him, and she told the magistrate who took her acknowledgment that she had been compelled to sign; that simultaneously with the execution of the deed another was ready for execution by W. B. to C. T. Mason; that her deed was dated June 6, 1884, and filed for record April 4, 1885, and on August 28, 1884, W. B. Mason executed conveyance to C. T. Mason, and this was filed for record April 4, 1885, and the point is made that the similarity of names and the lapse of only about two months between dates should put a purchaser on notice; that from then on C. T. Mason used the lands as his own, pocketing rents, etc.

The bill further charges that the sale was made subject to dower and homestead rights, but, as these are not controverted, they need not be dwelt on. The bill proceeds to charge that, on January 23, 1891, C. T. Mason and his wife, Josephine, mortgaged the lands to secure a loan of $7,100 from the Equitable Mortgage Company, which the bill says had actual and constructive notice of the facts averred, and that a pretended

sale was made, not in compliance with the terms of the mort-
gage, to the Equitable Sureties Company, which was the
same corporation, and which had like notice, and that it con-
veyed to J. L. Hurley, who had like notice.   The bill then
states that C. T. Mason died intestate September 24, 1891,
leaving his said wife, Josephine, his only heir at law, and she
became his administratrix.   She afterwards contracted a third
marriage with a Mr. Reuter, and the prayer is for cancellation
of conveyances, and for rents and profits, and the chancellor
granted the relief.   Everything material is denied by the
answers.

There is no proof whatever of any fraud or collusion between
C. T. Mason and Mrs. Williams, by which he bought her claim
on Mr. Deason's estate.   The contrary appears to be the fact,
and that he bought to protect the estate, and gave time, and
finally the sale was made to reimburse him.   There is no proof
whatever that he bought this claim with money of the Deason
estate.   On the contrary, what proof there is goes to show that
he bought it with his own money, and that he was a man of
large property in his own right, and that his widow, Josephine,
formerly Mrs. Deason and afterwards Mrs. Reuter, was his
sole heir.   It must be noted, also, that, in all the proceedings
in the administration of Mr. Deason's estate and of the sale of
the lands, everything appears to be precisely regular on the
face of the record.   Every account and petition and power of
attorney to sell, report of sale and petition to confirm sale were
signed, and, when the law required, sworn to by Mrs. Deason
as administratrix.   It must be noted, also, that all and every
of the charges in the bill of intimidation, duress, threats of
personal violence, etc., as having been used towards Mrs.
Mason are simple generalities; that they state merely the con-
clusions of the complainant, and do not specify anywhere any
fact from which the court could judge of the correctness of
such conclusions.   It is also true that the testimony is silent as
to particulars and utterly fails to specify any act or word from

Mr. Mason from which the court could infer any duress, threat of violence or intimidation of any kind or degree, though the widow, Josephine, was herself a witness, and must have been familiar with the details.

There is no proof to raise, more than a mere suspicion from results, that Mr. Mason was scheming to get the title in his own name, or doing more than to collect his debt, except certain letters from his counsel, to be hereafter noticed.  The only other thing squinting this way is that Mrs. Reuter, in answer to a question as to this, says : " Well, his object was to get the title in his own name.  I never heard him say this.  This is a matter of inference. "  There is no proof whatever that W. B. Mason was not present and a bidder at the sale, or did not pay his bid, and absolutely none of any malversation or misappropriation by C. T. Mason of the funds of the estate. On the contrary, the administration appears in all respects regular, and with full  accounting and proper vouchers. It is perfectly clear, also, that the Equitable Mortgage Company and its vendee, the Equitable Sureties Company, and its vendee, Mr. Hurley, were purchasers absolutely innocent of any actual knowledge or notice of any vice in the title dehors the record, and the record itself showing none.  Therefore, in order to affect them with notice, or to put them on inquiry, as to matters *in pais*, proof is adduced as follows : That Mr. Scott, an attorney at law, was the legal adviser of Mrs. Josephine Deason while she was administratrix, before she married Mason, and of Mason after her marriage ; that he conducted the sale, preparing all the papers ; that he wrote certain letters to Mr. C. T. Mason, showing his knowledge of the purpose of Mr. Mason to get the title in himself, which letters will be hereafter adverted to ; and that he was the attorney of the Equitable Mortgage Company, and made the abstract of title on which that company made the mortgage loan, nearly seven years after the court sale, and likewise as to Hurley when he bought, and that Scott was chargeable with notice of the defect

dehors the record, which notice to him was notice to his principals. The petition for the court sale was filed April 30, 1883; the decree for it was rendered at the May term, 1883, and the sale made in February, 1884, and duly confirmed, the mortgage to the Equitable Mortgage Company being of date January 23, 1891. As a witness, Mrs. Josephine Reuter, formerly Mrs. Mason, and before then Mrs. Deason, testified that about two months after Mr. Mason's death, which occurred September 24, 1891, she saw Mr. Scott on a railroad train, and told him she wanted to sue for the land, and he laughed at her, and told her she could do nothing; that Mr. Mason had a *bona fide* title; and that she replied that if "we failed to pay the mortgage we would sue for it;" and that she went to him "after that, and before the land was sold to Mr. Hurley, and asked him if he would take the case for me, but he refused to take it, stating he was attorney for both parties; he afterwards stated that it meant the loss of $1,000 or $1,500 fee for him not to take it against me; he told me it would have been better for me that he did not take it, as he could then give his testimony for me."

The only letters bearing in any degree on this case from Mr. Scott are these, all to Mr. C. T. Mason. One is of date July 25, 1882, as follows: "Has Mrs. Mason, as administratrix, sold all the personal property of the Tom Deason estate? If anything whatever is now left unsold, send me a detailed list of such articles, with estimated value of each. Second, if there are any debts unpaid send me a list of them, with names of creditors and amounts due each. I have received the record from Oxford, and desire to get your claim against the estate in shape for collection." This letter was long before the petition for the sale of the land, and has no significance in fact to the question in hand. It was a very proper letter from counsel advising and conducting the administration of an estate and representing an undoubtedly valid claim against it. Another is of date October 26, 1882, about six months before the peti-

tion for sale was filed.   It is as follows: " Inclosed find your petition to enforce judgment against the Deason lands.   According to my understanding from you, there is now a balance due you of $3,577.31.   Look over the statement and see if that is correct, as I can't be sure, and must depend on you for this information.   I have informed you fully of the difficulties and uncertainties in this case, and the trouble that may arise in the future over any title you may acquire to the lands.   I will, of course, do my very best for you in the case, and it may be that no attack will be made on the title, but it is my duty to tell you that there may be, and you take the title with this risk to run.   You paid in the purchase of this note a large sum of money, which the estate has been unable to pay you, and there is no reason why you should be expected to wait for it any longer, as you need the amount now due you in your own business.   I will try to collect for you, and, as the estate is unable to pay, part of the land will have to be sold for that purpose. If you buy at this sale, the danger to the title above mentioned does not arise from the want of a good claim on your part against the estate, for I know you paid your money to buy the Williams note, and that you had to mortgage your lands to raise it.   But the trouble comes from the fact that it is difficult to bind a minor, and from the fact of your relationship to the administratrix.   Sign affidavit annexed to petition, send back to me, and I will do the best I can with it.   I also inclose Mrs. Mason's third annual account, which please examine, and if all right let her sign affidavit and return to me.   You will have to send down to me by November 6 vouchers for all items of credit we claim."

Another letter, dated June 11, 1884, is this: "Inclosed find the deed from Mrs. Mason to your brother, which you can have her sign and acknowledge, and you can get your brother to deed the property back to you, after which I will write the deed for one-half of it at some future time to Ann Deason. The deed from your brother it would be well to get at once, as

life is uncertain. He might die, and cause some inconvenience. Let the consideration be, say, $3,000. Please post the notice of sale on front of your store, and be sure to write me what day exactly you post it, so I can take your affidavit to that effect.'' Another letter, dated April 17, 1885, is this: ''I inclose the two deeds as requested. I suppose you know that after they are executed the property will become the property of the minors, and the rents will belong to them.'' The reference to Ann Deason in the next to the last letter and to the minors in the last is explained by the testimony of Mrs. Reuter, formerly Mrs. Mason, to be that Mr. Mason designed, first, to put a half interest in complainant, a child of the Deason marriage, and afterwards to convey the whole to her and a female child of the Mason marriage, and when that child died he had the purpose to put the whole in complainant and a male child, who also died. All this was with his wife's approval, but seems never to have been carried out, though the deed was prepared.

Mr. Scott was not made a, witness by either party, nor were Mr. Mason's letters to him on the subject of Mr. Scott's letters to him produced or called for by either side, so Mr. Scott's letters must be construed as best they may be by their own context.

His abstract, approved by Messrs. Miller, Smith & Hirsh, of course refers to the record of the court sale as a link in the chain of title, and this abstract, so approved, was the basis of the loan from the Equitable Mortgage Company, and the trust deed to secure it, under which appellants claim.

On the case presented this court concludes that the decision must rest on the question as to how far, and under what circumstances, notice to an agent or attorney is notice to the principal. In this inquiry the whole matter must turn on examination of the facts, in the light of the legal principles universally recognized, that the law favors innocent purchasers, and that even a *mala fide* purchaser from a *bona fide* purchaser gets a good

title.   In this view, it is unnecessary to consider the relation which Mr. Hurley, the last purchaser, bore to the land until we have determined that of the Equitable Mortgage Company, the first purchaser; because, if it shall appear that it took without notice, Mr. Hurley's title is good, whether he had notice or not.   Restating the facts as to this, it appears that the Equitable Mortgage Company loaned $7,100 with absolutely no' notice, in fact, of any defect in the title, and that, as we hold to be clear, there is no notice in the record, and nothing there which would reasonably put that company on inquiry into matters dehors the record.   In this condition of things, it develops that Mr. Scott was employed by the company to make an abstract of the title, the same to be for approval or disapproval by Messrs. Miller, Smith & Hirsh, who did approve it, and thereupon, and because thereof only, the money was loaned and the mortgage taken, and that Mr. Scott was also the agent of Mason and wife, the mortgagors, to negotiate that loan, and that Mr. Scott had also, as attorney, nearly seven years before, conducted the proceedings for sale.

A treatment of all the phases of the doctrine of notice to agents will be found in 1 Am. & Eng. Enc. L., pp. 1144–1161, and the citations are full, and, so far as we have verified them, quite accurate.   In all of them, as in case of all principles, the courts are in separate droves, following the lead of certain original decisions on the various phases of the doctrine, and, as usual, it will be seen, as I think, that the departures from the main road are simply near cuts to avoid hard cases. Basic principles ordinarily ignore individual hardship, and are laid down for the general good of society at large, and to secure the greatest good to the greatest number.   They are fixed to promote confidence in the multiplied transactions of business life, and too often they are disturbed by modern courts to avoid particular hardship, and thus, to avoid harsh results to one individual, they not only inflict them on another equally innocent, but also on the body politic.

Pursuing the order and substance of 1 Am. & Eng. Enc. L., some decided principles may be thus stated: (1) Notice to an agent, given to him while he is such agent, is notice to the principal. All the authorities concur in this general rule, based, as Lord Brougham says, on "the policy and safety of the public." (2) Notice to the agent is not notice to the principal where the notice to the agent was acquired by him confidentially as attorney for a former client in a prior transaction. This is held by the great numerical preponderance of decisions, though denied by some. (3) Notice to an agent is not notice to the principal, where the agent is acting in his own fraud in his own interest. There seems to be no dissent as to this, and it is based by some on the reason that the agent could hardly be expected to communicate to his principal what he is fraudulently interested in concealing, and based by others on the reason that an independent fraud of the agent on his own account is beyond the scope of his employment. (4) In 2 White & T. Lead. Cas. Eq., pt. 1, p. 178, notes, which contain a very full discussion of nearly every phase of the question, a modification is given of the doctrine in its application to notice to attorneys at law. It is there said: "It would also appear that, to render the knowledge of an attorney the knowledge of his principal, he must be an attorney in fact." Then, after stating where the notice to the attorney is such to the principal, the note proceeds as follows: "But the case is obviously different where an attorney who has been retained to examine a title conducts the investigation in the usual course of his business, without discovering a break or flaw, and so informs his client, without disclosing a fact which he has learned incidentally in examining the same title for another party. Under these circumstances, the purchase is not made through the agent, nor does he practice a fraud on the equitable owner. His failure to disclose the truth may be wrongful, or it may be dictated by a sense of professional obligation to the person for whom he was acting when he obtained the in-

formation.    But there is nothing to affect the conscience of the principal, nor can he be said to have constructive notice of that which he would not have ascertained if he had examined the title instead of employing an attorney.''

The foregoing propositions are stated here because, in one view or another, some, or all of them, may perhaps seem to be developed by this record, and we state them to exclude the conclusion that the opinion is based on any one of them.  Without now committing ourselves to any of them, except, of course, the first, which is the bottom principle of all of them, and expressly negativing any idea of committal to the view that any knowledge of the agent obtained previous to the commencement of his agency may or may not affect his principal, we proceed to state the precise ground upon which we decide this case, and on which we all agree.    We refer the bar to the notes of Mr. Freeman in *Melms* v. *Brewing Co.* (Wis.), 57 Am. St. Rep., 914–919, s.c. 66 N. W., 518, for an exhaustive analysis of authorities, and the writer refers to his conclusion on page 919.    It is beyond dispute that the utmost limit to which the courts have gone in the line of present inquiry, in order to affect the principal by the antecedent knowledge of the agent, is to show, by '' clear and satisfactory proof,'' that the antecedent knowledge was present in his mind while negotiating the new transaction.    *In re Distilled Spirits*, 11 Wall., 356; 20 L. Ed., 167; *Constant* v. *University*, 111 N. Y., 604; 19 N. E., 631; 2 L. R. A., 734; *Bank* v. *Chase*, 72 Me., 226; *Melms* v. *Brewing Co.*, 93 Wis., 153; 66 N. W., 518; 2 Pom. Eq. Jur., 672.    From these authorities it also appears that the courts will presume forgetfulness until overcome by evidence, unless the occurrence was so recent as to make it incredible.    In the case from 72 Me., 228, 229, it is held that '' the knowledge must be present to the mind of the agent when acting for the principal ; so fully in his mind that it could not have been at the time forgotten by him.''    No court can say this of any lawyer in reference to any transaction or incident

in his practice over six years old. There being no evidence whatever of his recollection in the present case, the decree below, in so far only as it affects other than homestead lands, is

*Reversed and cause remanded.*