INTERSTATE LIFE & ACCIDENT CO v. POTTER—68 S. W. (2d) 119.

Middle Section.    October 7, 1933.

Petition for Certiorari denied by Supreme Court, February 24, 1934.

382

W. E. Norvell, Jr., of Nashville, and S. G. Butler, of Sparta, for complainant.

Finlay & Campbell, of Chattanooga, for defendant.

DeWITT, J.　The issue in this cause is whether T. K. Potter, executor of the will of John H. Potter, deceased, is entitled, under his cross-bill, to recover of the insurance company upon two policies of insurance upon the life of John H. Potter, issued to him on August 6, 1931; or the company is entitled, under its original bill, to have said policies declared void and canceled for fraudulent representations or concealments alleged to have been made by John H. Potter as inducements to the issuance of the policies. The cause was heard by the chancellor upon oral testimony and depositions, and under an agreement of counsel waiving a jury which had been demanded by the executor, and submitting to the chancellor, sitting as a jury, the cause, his decision to have the weight and effect of a jury verdict. The chancellor dismissed the original bill, and under the cross-bill he awarded to the executor a recovery of the full amount, $10,000, designated in the policies, with interest; but he denied any penalty, holding that the evidence showed that the refusal of the company to pay was in good faith. An elaborate motion for new trial was made and was overruled; whereupon the insurance company has appealed to this court and presented many assignments of error. Of course, under this stipulation, this court can only look to the record to determine whether or not there is material evidence to support the findings of fact made by the chancellor.

Mr. John H. Potter was a banker of Sparta, Tenn., nearly 63 years of age, when he made application in writing for these policies on July 25, 1931. He died on June 3, 1932, of cancer of the liver.

In his application for each policy, signed by him, there were the following recitals:

"12 (a) I hereby declare that I am in good health and of sober and temperate habits.

"(c) I agree that there shall be no liability hereunder until a policy shall be issued and delivered to me while in continued good health, and the first premiums thereon actually paid during my lifetime, provided however that if said premium is paid in full to the said Company's agent at the time of making this application, and if said Company's medical director shall approve this application without change, then the insurance (subject to the provisions of the policy) shall be effective from the date of this application."

The statement made to the company's medical examiner, Dr. E. B. Clark, of Sparta, on July 31, 1931, signed by John H. Potter, contained the following recitals:

"I agree (1) there shall be no liability hereunder until a policy is issued to and received by me and the first premium thereon actually paid during my lifetime while in good health; . . .

"I hereby declare that all statements and answers as written or printed in this application (consisting of parts I and II) are full, complete and true, whether written by my own hand or not; and I agree that their truth is a material inducement to, and the basis of any insurance issued hereon, and I hereby authorize any physician or other person who has attended me, or may hereafter attend me, to disclose to said Insurance Company any information thus acquired."

The representations made by Mr. Potter to the company through its medical examiner, and which are claimed to have been false and fraudulent, and upon faith of the truth of which the policies were issued and delivered, are as follows:

"13. Name below all causes for which you have consulted a physician in the last ten years.

| Illness | Number of Attacks | Date | Severity and Duration |
|---|---|---|---|
| Influenza | 1 | 1930 | Short |
| Any Remaining Effects? | | | Attending Physician's Name and Address |
| None | | | E. B. Clark, Sparta, Tenn." |

"15. Has any medical examiner or physician, formally or informally, expressed an unfavorable opinion as to your insurability or health? No."

"21. Have you now, or have you ever had, fits or nervousness, rheumatism, asthma, pleurisy, spitting of blood, gallstones, ear abscess, any disease of heart, lungs, stomach or kidneys, or any other disease or injury? Give details, dates, etc., of any history noted above. No."

It is undisputed that in April and May of the year, 1930, Mr. John H. Potter consulted Dr. E. B. Clark, of Sparta, and Dr. J. C. Pennington, of Nashville, for kidney, bladder, and prostate trouble; that, when Mr. Potter came to Dr. Pennington in April, 1930, the doctor found that he had a low grade pyelitis, which means an inflammation or infection in the kidney pelvis, together with cystitis, which means an inflammation or infection in the bladder, also prostatitis, which means inflammation or infection of the prostate gland; that Dr. Pennington treated him for these troubles on nine days within a period beginning April 21 and ending May 22, 1930. Dr. Pennington testified that the infection was due to colon bacillus, which was not serious unless it would take a turn to something else; that physicians never knew when such a case would be serious; but that the treatment which he gave him and which was continued by Dr. Clark after Mr. Potter's return to Sparta relieved him and he got well. The treatment consisted of injections of urotropin into a vein for the purpose of washing out the kidneys and removing pus therefrom. As it appears without dispute that in January, 1932, Mr. Potter had diabetes, it is proper here to recite that Dr. Pennington testified that he did not have diabetes in the spring of 1930 when he thus treated him.

Dr. E. B. Clark continued giving the injections of urotropin under suggestions given by Dr. Pennington in a letter to him when Mr. Potter returned to Sparta. More than a year then elapsed until the insurance was applied for. There is no evidence that Mr. Potter consulted a physician during that period. There is abundant evidence that he was constantly at work at his business, and to Dr. Clark and to laymen he appeared to be in good health. Dr. Clark testified that he acted for the company as medical examiner of Mr. Potter as to his application for the insurance; that he wrote the answers to the questions just as Mr. Potter gave him the answers; that he considered him well and all right; that he did not put in this paper any statement of Mr. Potter's three troubles from infection in the spring of 1930, and his consulting him and Dr. Pennington, because he considered them as minor troubles which had passed away. He said that he gave him a physical examination in connection with the application, having a urine test made by Dr. Upchurch, an expert, which showed no sugar, albumen, or casts, and he did not have diabetes. He said that Mr. Potter had never said anything to him indicating that he had had serious physical trouble, prior to July 31, 1931, when he made the

examination and wrote down the answers to the questions; that he never heard him mention a loss of strength; that he never examined his abdomen before January, 1932. He said that he understood that he had been treated for pyelitis and the pus had cleared up. He also said that he did not know what Dr. Pennington was having the injections made for when he made them, more than a year previously. He said that Dr. Pennington wrote him that he had found some pus in the urine and asked him to give him urotropin, but he did not remember what he wrote him about the prostate gland and the letter had been destroyed. There is no evidence that Mr. Potter made any statement to Dr. Clark on July 31, 1931, as to his having been treated by him and Dr. Pennington in 1930. In his testimony, answering the question why he did not put into his report or fill it in the application that Mr. Potter had had the infection and had been treated by him and Dr. Pennington, he said: "At that particular time I don't know why I didn't, I absolutely disregarded it, never thought any more about it, no more than any other little minor ailment." He said that he regarded it as minor because he thought he was all right; that there was absolutely no collusion or agreement between him and Mr. Potter to deceive the insurance company.

Dr. Pennington produced his record of examination of Mr. Potter, made on April 21, 1930, containing a statement that he had chronic prostatitis. As aforesaid, he testified that he got well of it.

Dr. Clark testified that he saw Mr. Potter every day in the autumn of 1931 as he went to and from his work; that, as far as he could tell, he was all right; but he did tell him that he had a good deal of gas on his stomach and asked him as to taking magnesia, which Dr. Clark approved; that a few days he did mention having rheumatic pains in his legs, and asked him about taking aspirin, which he approved. He said there was no continuous complaint or complaint of continuous pain before January, 1932; he said that these complaints were very rare; he said that on January 15, 1932, Mr. Potter was suffering intense pain in his leg, and he attributed it to being on his feet all day and late at night, he being unusually busy with his bank at Sparta and liquidating a failed bank at Doyle. He said that he examined him and gave him an opiate for the pain, gave him an X-ray examination, and found a mass in his abdomen, an enlarged liver, and told him so; that Mr. Potter then went to consult Dr. H. W. Bass at Gadsden, Ala., and came back and reported to him a diagnosis by Dr. Bass of cancer of the liver.

Of course, we are dealing with a status as of July 25 and 31, 1931, but the insurance company relies upon a large amount of testimony as to diseases of Mr. Potter revealed in January, 1932,

both as to the actual facts and as to the opinions of professional experts.

Dr. Bass testified that he examined Mr. Potter on January 25, 1932; and he exhibited his record of the examination and his conclusions therefrom. It is very elaborate. His conclusions were that Mr. Potter then had the following diseases: "Chronic tonsilitis; diabetes; metastatic carcinoma of liver; carcinoma ascending colon; metastatic carcinoma of spine." No attack is made upon this finding, and it is treated as undisputed. The testimony of Dr. Clark and Dr. Upchurch is material evidence supporting a conclusion that Mr. Potter did not have diabetes on July 31, 1931. There is no evidence that he had chronic tonsilitis at that time, or had had it. There is a large amount of testimony upon the question whether or not Mr. Potter had a cancerous condition of the liver, colon or spine on July 31, 1931; in other words, whether or not such a cancerous condition as it indisputably existed in January, 1932, must have existed in an earlier stage in July, 1931. This question appears to be speculative in character. There is no evidence that any one found or knew of such cancerous condition at that time. The evidence is that there are in general two kinds of cancer, sarcoma and carcinoma; that a metastatic carcinoma is a cancer that originates at some place in the system but the germs travel to anoter place and the carcinoma develops there.

Dr. H. L. Fancher testified that such a cancer takes anywhere from six months to two years to develop.

Dr. J. W. Horton testified that, when a swelling has appeared across the upper abdomen, he would assume that the person had had cancer not less than six or eight months and perhaps a year or two; but he said that a mere swelling of the abdomen does not mean anything seriously wrong. His statement as to the particular swelling was based upon the assumption that it was due to cancer. He said that a man can have cancer of the liver without knowing what is wrong.

Dr. H. M. Tigert testified that a positive diagnosis of cancer extending back over a period of five or six months cannot be made; that a person might have had it a year, but that his statement positively that he did have it for that time is highly speculative.

Dr. Bass testified that from statements made to him by Mr. Potter on January 25, 1932, he made the following record:

"Present History.

"For the past two or three years has noticed abdomen seemed to swell or bloat at times with an uncomfortable feeling, six or eight months ago noticed pain down the inner and posterior side of right leg, soon changed to lateral and posterior side of leg, pain seems to radiate downward into calf and foot. There is numbness of great toe and foot at times. This has gradually gotten

worse. Last Tuesday noticed soreness in right flank and back. Pain seemed to be worse at night. Morphia for an attack last week after a rather hard day of work. No swelling or redness of the joints. There has been a loss of ten pounds or more in weight in the past few months. There has been a marked loss of strength for the last year. Has noticed inability to walk as formerly did, and has been unable to stand on feet on street for any length of time.''

Dr. Bass was asked and answered as follows:

''Doctor if a man had been suffering with pain six or eight months, there is no doubt but what he knew about it? A. He stated that he knew it.''

Dr. Bass was further asked and he answered:

''What in your opinion was this pain due to? A. I could not say, I do not know (even after the examination). It could be due to either one of two things.

''Q. What are those things? A. It could be due to the malignant trouble, or to diabetes.

''Q. In your opinion was it due to one or the other of these two things? A. Yes sir, wait a minute, let me look here (looking at paper) yes sir that is right.

''Q. The malignant trouble you refer to is that cancer or not? A. Yes sir.''

The question and answer as to the opinion of the witness as to what the pain was due to were excluded upon objection.

There is no evidence that in July, 1931, Dr. Clark knew that Mr. Potter had had a marked loss of strength. Drs. Fancher, Horton, and Tigert testified that, if a man had had a marked loss of strength for a year, he would not be in sound health.

We bear in mind the testimony of Drs. Pennington and Clark that Mr. Potter was cured of the infection of kidney, bladder, and prostate gland; and this tends to show that, when he applied for the insurance, he did not have these troubles, and that he did not think that he was in unsound health on account of such troubles. On the other hand, Dr. Fancher testified that pyelitis is always serious; that it can be cured, but is liable to break out at any time; that if a man sixty-three years of age has chronic prostatitis he would not think that he could get well, however, Mr. Potter was not sixty-two years of age at the time that he was treated for this trouble and regarded as cured by Drs. Pennington and Clark. Dr. Fancher was of the opinion that a person might go for an indefinite period without symptoms of pyelitis; but he also said that, if a man goes for eighteen months without symptoms, of chronic pyelitis, it was a very mild type or had been cured. He then said that, if he went for that period without symptoms of infection of bladder, from colon bacillus, it is pretty good proof that he was

cured. Dr. Horton said that a man of that age never gets well from chronic pyelitis; that a lower grade of it is slower in older people; that it lowers resistance, affects the nervous system, and by the direct effects of its own poison. He also said that when cancer becomes present prior to a diagnosis is problematic. Dr. Tigert testified that pyelitis is serious in some cases, in others not serious; that it may be very mild; that a description of Mr. Potter's case of it as given in a hypothetical question to him, showed that it was a mild case and not serious. He said that the description of the prostatitis showed that it was not serious and he would say that he had recovered. He said that pain in the legs could come from strain and exposure, or from a tonsil infection. He also said that, if the prostate gland was abnormally larger than it ought to be, and soft, that indicated disease in it; that, if that disease subsided and the prostate gland returned from a soft to a firm state, that would indicate a return to a normal condition. He said that a person was not in sound health if he had a very marked loss of strength for over a year. It appears without dispute that the colon bacilli infection which Mr. Potter had had could have no connection with cancer of the liver.

Mr. Potter's son, T. K. Potter, testified that in July, 1931, his father was in excellent condition, walked a great deal, attended to his work, and his apparent vigor was above the average for a man of his age. He said that, aside from just getting tired from work, he did not notice any change until about the middle of December, 1931, or afterward.

Other witnesses who saw him constantly in the summer of 1931 testified that he appeared to be in good condition.

The defenses made are that Mr. Potter was not in sound health when the application was made and the policies were delivered; and that the company was induced to issue the policies by a false statement that he had never hay any disease of the kidneys, or any other disease or injury, and concealed the fact that he had had pyelitis, cystitis, and chronic prostatitis. It is insisted that the company would not have accepted his application had it known that he had had these diseases in the spring of 1930.

1. Although in his application he declared that he was in sound health, and in his written examination, near the end thereof, he agreed that there should be no liability thereunder until a policy should be issued to and received by him while in good health, he was asked by Dr. Clark, in a prior part of this examination:

"Are you now in good health as far as you know and believe?"
To this question his answer was: "Yes."
Each policy recited:
"This policy is issued to take effect on the 6th day of August, 1931 in consideration of the statements submitted in the applica-

tion herefor, copy of which is attached hereto and made a part hereof.''

Also the following provision:

"This policy, including the copy of the application hereto annexed and made a part hereof, constitutes the entire contract between the parties hereto.''

In Metropolitan Life Insurance Co. v. Chappell, 151 Tenn., 299, 269 S. W., 21, 22, cited in 40 A. L. R., 662, a provision in a policy of industrial life insurance, "No obligation is assumed by the company prior to the date hereof, nor unless on said date the insured is alive and in sound health,'' was held to be valid and binding on the insured. Upon the meaning of the phrase, "sound health,'' the court said: "As used in life insurance policies, there is no material difference between 'sound health' and 'good health.' This court treated them as practically synonymous in Life & Casualty Ins. Co. v. King, supra [137 Tenn., 685, 195 S. W., 585]. The phrase 'sound health,' when used in the sense used in the policy under consideration, is not to be taken literally. It does not mean perfect health, or imply absolute freedom from bodily infirmity or tendency to disease, but means generally the absence of any vice or disease in the constitution of a serious nature, or that had a direct tendency to shorten life, as contra distinguished from a temporary ailment or indisposition.''

█ █ In our opinion, there was substantial evidence upon which the chancellor could base his conclusion that Mr. Potter was in good health within this definition of the term, when the application was made and when the policies were delivered. The testimony of physicians, hereinbefore recited, tended to show that his diseases of kidney, bladder, and prostate gland were mild, that they yielded to treatment, and that he was cured of these troubles. There is no evidence that they arose again. About eighteen months after his treatment for these diseases, upon careful examination, these troubles did not appear, and there is no positive evidence that he had them after May or June, 1930. What he had in January, 1932, were diseases other than these. He had no diabetes when he was examined by Dr. Clark and Dr. Upchurch; nor is there any evidence that he then had chronic tonsilitis. The claim that he had a cancer at that time rests entirely on speculation. The burden was on the insurer to show that he was not then in good health. If for more than a year prior to January, 1932, he had a marked loss of strength, there is evidence that it might have been due to any of several causes, among them his heavy and constant work as a banker. This could fairly be interpreted as not due to disease of a serious nature and a temporary trouble relievable by slackening of effort and rest. Dr. Horton's opinion that the pains radiating down the leg were serious related to the time in January, 1932,

when it was known that Mr. Potter had cancer and diabetes. Dr. Bass' record as to these pains was that Mr. Potter said that "six or eight months ago noticed pain down inner and posterior side of leg, soon changed to lateral and posterior side of leg, pain seems to radiate downward into calf and foot." Dr. Fancher merely said that these pains might be due to cancer. Dr. Tigert said that these pains could come from strain, exposure, tonsil infection, trauma, or interferences with the nerves. The expression "six or eight months" is indefinite and but approximate. It does not mean positively that the pains were being suffered at the time the insurance was effected. It was not error for the chancellor to exclude as inadmissible the opinion of Dr. Bass that the pains were due to diabetes or to cancer. There were several antecedents to which the pains might be attributed. Lewisburg & N. R. Co. v. Causey, 6 Higgins (6 Tenn. Civ. App.), 407; Cumberland Telephone & Telegraph Co. v. Peacher Mill Co., 129 Tenn., 374, 164 S. W., 1145, L. R. A., 1915A, 1045.

It is undisputed that pyelitis, cystitis, and prostatitis are diseases; and that Mr. Potter was afflicted with them and consulted physicians and was treated by them for these diseases in April and May, 1930. There is evidence that he was soon cured of these diseases. There is no positive evidence that they recurred in him. There is evidence from which the chancellor could reasonably conclude that his personal physician and the company's medical examiner, Dr. Clark, knew on July 31, 1931, that Mr. Potter had had these diseases in 1930 and was treated for them and believed that he had been cured and considered them as minor ailments. This knowledge was acquired by Dr. Clark while he was acting solely as the personal physician to Mr. Potter.

█ It was the duty of Mr. Potter to answer the question propounded to him by stating fully and frankly the facts as to his previous affliction with those diseases and his consulting physicians for them. However, it may be inferred from all the circumstances, including the fact, as shown, that he was a man of high character, that he and Dr. Clark considered those previous troubles as mild, cured, and having no bearing upon his general health and continuance of life.

Shannon's Code, section 3306 (section 22, Chapter 160, Acts of 1895), provides that:

"No written or oral misrepresentation or warranty therein made in the negotitions of a contract or policy of insurance . . . by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation . . . is made with actual intent to deceive, or unless the matter represented increase the risk of loss."

■ Such misrepresentation would be material if it would naturally and reasonably influence the insurer and induce it to decline the application. Volunteer State Life Insurance Co. v. Richardson, 146 Tenn., 589, 244 S. W., 44, 49, 26 A. L. R., 1270. In the opinion in that case it was declared:

"When the court found in this case that the answers made by the applicant with respect to the extent of his use of intoxicating liquors were false, then they did increase the risk of loss within the meaning of our statute, if the matter itself was reasonably and naturally calculated to affect the insurer's judgment. Whether the matter represented did or did not contribute to the cause of death or impair the health of the applicant was a material matter for the determination of the question of the truthfulness or fal·ity of the answer; it is not determinative of the question of whether or not it increased the risk of loss, for that is a question of law to be determined by the court after it is ascertained that the answer was false.

"It is not to be left to the insurance company to say after a death has occurred that it would or would not have issued the policy had the answer been truly given. It is true the practice of an insurance company with respect to particular information may be looked to in determining whether it would have naturally and reasonably influenced the judgment of the insurer, but no sound principle of law would permit a determination of this question merely upon the say so of the company after the death has occurred. The matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment. No misrepresentation of a mere trifling instance in the applicant's health, or the giving of a wrong opinion about the state of his health, if he might honestly be mistaken about it and not fully appreciate the dangers incident to the affliction, will render the statement false or avoid the policy, merely because an insurance company may say that it would not have issued the policy otherwise."

■ False statements of the applicant for insurance that he has never had any "serious illness," or that he has not had certain diseases, will not forfeit the policy or render it void, unless the diseases with which he was afflicted were permanent, habitual, and constitutional affections, indicating some vice in his constitution, and having some bearing upon his general health and continuance of life; for false answers as to mere temporary ailments that are curable and pass away will not suffice to avoid the policy. Rand v. Provident Sav. Life Assur. Society, 97 Tenn., 291, 37 S. W., 7; Knights of Pythias v. Cogbill, 99 Tenn., 28, 41 S. W., 340; Woodward v. Insurance Company, 104 Tenn., 49, 56 S. W., 1020; Insurance Co. v. Lauderdale, 94 Tenn., 642, 30 S. W., 732. In Hale v.

Sovereign Camp, W. O. W., 143 Tenn., 555, 226 S. W., 1045, 1049, this rule was reaffirmed (citing the same cases) in the following language:

"The mere omission of an applicant to mention a disease which does not, directly or indirectly, cause his death, can but be an immaterial matter in an action for the insurance. Such an omission does not affect the risk, and cannot be properly characterized as a fraudulent concealment. It is not every slight or temporary illness, and especially when not specifically inquired about, that must be revealed. Only those attacks which have, in some degree, a detrimental influence upon the general health or constitution of the applicant are material to the risk, and therefore within the rule as to warranties."

There was evidence upon which the chancellor could predicate his conclusion that the case came under this rule—that the misrepresentation was not material to the risk, inasmuch as the diseases were mild, were cured, and did not recur. However, it is also insisted as a ground for recovery that the company is estopped by the knowledge of the company's medical examiner, Dr. Clark, imputable to the insurer. It is well settled in this state that the knowledge of such local physician acting for the insurer is the knowledge of his principal; that, while he is an agent with limited powers, his acts in and about the business intrusted to his care are binding within the scope of his authority, and, to this extent, the general rules of agency are applicable to him as to other special agents. Bennett v. Insurance Co., 107 Tenn., 371, 64 S. W., 758; Knights of Pythias v. Cogbill, supra; Hale v. Sovereign Camp, supra. These, however, were cases in which the medical examiners acquired the knowledge of falsity of representations while acting in the course of their employment as such examiners. In Union Bank v. Campbell, 4 Humph., 394, the following rules were declared:

"We do not intend to controvert the general doctrine, that 'notice must come to the agent while he is concerned for the principal, and in the course of the same transaction;' for notice to a party while he is not acting as agent, is certainly no notice to a principal for whom he may afterwards act. But the existence of knowledge in an agent, when acting for his principal, is notice to the principal, however that knowledge may have been acquired. Thus if an agent, in his own transaction, has had notice of a fact, that notice does not reach his principal, because he is not then acting for his principal; and before he comes to act as such agent, in relation to the subject about which he had notice, he may have forgotten the whole matter; so that it was never present in his mind, while discharging the duties of his agency. But if he had received the notice while he was concerned for the principal, the principal

would be bound by it, though the agent might forget the facts, and have no memory of them, during the transaction to which they relate. But certainly, if while an agent is concerned, and acting for his principal, he have knowledge of the facts in relation to which notice is necessary, there can be no necessity for giving formal notice of the same facts, to the individual who already knows them.''

The following cases also support the rule that the principal is bound by the knowledge of his agent in the mind of the agent at the time he is acting for the principal: Duke v. Harper, 6 Yerg., 280, 27 Am. Dec., 462; Tagg v. Tennessee National Bank, 9 Heisk., 479; Raht v. Mining Co., 5 Lea, 1, 63; Bank v. Smith, 110 Tenn., 337, 75 S. W., 1065. In 32 C. J., 1326, after the general rule is stated that the knowledge which will affect an insurance company must be gained by the agent while acting for the company for the matter to which it related, it is said in the text, citing many authorities:

''But the company may be bound where the circumstances are such as to justify an inference that the knowledge was present in the mind of the agent at the time of the transaction in question, and, where there is no collusion between the agent and insured, the agent is under no duty to conceal from the principal the facts within his knowledge, and is under no duty to disclose them.''

In Mechem on Agency (2 Ed.), section 1809, is the following statement, supported by numerous authorities:

''It is indispensable to this rule imputing to the principal knowledge which the agent acquired before the creation of the agency, that it shall still be present in the agent's mind when he becomes charged with the duty of acting with reference to the matter to which the knowledge relates. A principal may be affected by knowledge which he himself once had, but has now forgotten. He may also be affected by knowledge which his agent acquired or had during the agency and under such circumstances as to make it notice, but which the agent has since forgotten. But he cannot be affected by information which one who is now his agent once had, but had forgotten before he became agent and before there were any facts to make it significant or any duty to report it or remember it or to govern one's conduct with reference to it. The agent's recollection must be not simply hazy and indefinite, but as definite and precise as would be required if now coming to the agent for the first time. It must also be present to his mind so nearly at least in relation to the actual transaction which it affects as to impose upon the agent the obvious duty to communicate it in reference to that transaction; it is sometimes said that it must be 'present to his mind at the very time of the transaction in question.' The question is a question of fact, and the burden of proving that the

agent had such recollection is held to be upon the party alleging it, and not upon the principal to show that the agent did not have it.''

In Constant v. University of Rochester, 111 N. Y., 604, 19 N. E., 631, 2 L. R. A., 734, 7 Am. St. Rep., 769, it is declared that the burden is on the plaintiff to prove ''clearly and beyond question'' that the agent remembered.

In Equitable Securities Co. v. Sheppard, 78 Miss., 217, 28 So., 842, the court goes so far as to say that it ''appears that the courts will presume forgetfulness until overcome by evidence unless the occurrence was so recent as to make it incredible.''

■ The chancellor made no specific finding whether or not Dr. Clark had the previous diseases in mind when he examined Mr. Potter; nor did he base his decree upon any estoppel. His view was that there was no fraudulent intent on the part of Mr. Potter, and that the previous ailments were minor in character and did not affect the risk. In our opinion, the evidence is not sufficient to justify the inference that the knowledge by Dr. Clark previously acquired as a personal physician was in his mind when he examined Mr. Potter, and therefore the claim of estoppel cannot be sustained.

■ As the charge of false and fraudulent representation was one that involved moral wrong, it was not error to admit testimony as to the good character of Mr. Potter. Spears v. International Insurance Company, 1 Baxt., 370; Continental Nat. Bank v. First Nat. Bank, 108 Tenn., 374, 68 S. W., 497; Rogers v. Stokes, 87 Tenn., 298, 11 S. W., 215; McBee v. Bowman, 89 Tenn., 140, 14 S. W. 481.

All of the assignments of error are overruled and the decree of the chancery court is affirmed. A decree will be entered in this court in favor of T. K. Potter, executor, against the Interstate Life & Accident Company and the surety on its appeal bond for the sum of $10,000, with interest from September 1, 1932, and all costs of this cause. The cause will be remanded to the chancery court of White county for an order to return to the company the premiums which it tendered and paid into the hands of the clerk and master.

Faw, P. J., and Crownover, J., concur.