## SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD, v. MRS. JENNIE MANKIN.

Middle Section.   May 14, 1927.

Petition for Certiorari denied by Supreme Court, December 3, 1927.

1. **Pleading. Under chapter 121 of the Acts of 1897 a plea to the merits does not overrule a plea in abatement.**
   Under chapter 121 of the Acts of 1897, a plea in abatement and a plea to the merits may be filed at the same time and both pleas shall be heard at the same time and judgment rendered on each plea.

2. **Pleading. Misnomer. Cured by amendment.**
   Misnomer of party is not a defect attended by grave consequences by reason of the statutory provision under which the defect may be remedied by amendment. An amendment inserting the true name of the party cures the defect.

3. **Pleading. Amendment relates back to date of original pleading.**
   If no other rights have intervened the amendment of a misnomer relates back to the date of the original pleading and service acquired under the original summons is good.

4. **Appeal and error. The appellate court must take the strongest legitimate view in favor of testimony supporting the verdict.**
   Where the facts are controverted and of such a character that different minds might reasonably draw different conclusions therefrom, the verdict of the jury is binding.

5. **Insurance. Instructions. Instruction on good health is proper.**
   In an action to recover on a life insurance policy where plaintiff's recovery depended upon whether or not the deceased was in good health at the time of reinstatement, the instruction on good health set out in the opinion, held a proper instruction.

6. **Appeal and error. Undisputed testimony can not be discarded or disregarded.**
   In an action to recover on a life insurance policy where the testimony of a medical expert as to the condition of deceased was undisputed by medical testimony but there was evidence of lay witnesses from which the jury might have found that the condition of deceased was not as testified to by the expert, held that it could not be found that the jury finding for the plaintiff disregarded undisputed testimony.

Appeal in Error from Circuit Court, of Grundy County; Hon. John T. Raulston, Judge.

Affirmed.

J. D. Fults, of Tracy City, for plaintiff in error.

J. Roy Hickerson, of Winchester, for defendant in error.

DeWITT, J. The Sovereign Camp of the Woodmen of the World, a fraternal benefit society, qualified to do business in the State of Tennessee, has appealed in error from a judgment against it for $1405 and costs, rendered by the circuit court upon the verdict of a jury, upon a benefit certificate in said society held by the husband of Mrs. Jennie-Mankin, the beneficiary named therein. Her husband, John H. Mankin died on December 25, 1918 of septicaemia or blood poison resulting from a carbuncle. The amount of the judgment included $1000, the amount of benefit provided in the certificate, and interest amounting to $405. The suit was instituted by summons issued on October 21, 1919 and served upon the Insurance Commissioner of the State of Tennessee on the following day. A number of assignments of error are presented all of which will be dealt with in the course of this opinion. For convenience, the parties will be referred to as plaintiff and defendant, as they stood in the circuit court. The original summons described the defendant as "The Woodmen of the World," a fraternal insurance association. To the declaration the defendant interposed two pleas, a plea of misnomer in abatement, and a plea in bar that it did not owe the plaintiff as in the declaration alleged. These pleas were filed on the same day. The plea in abatement is as follows:

"Comes the Sovereign Camp of the Woodmen of the World, in its own proper person, and for plea in this case says that there is no such corporation or fraternal insurance association as The Woodmen of the World; that the name of The Woodmen of the World in which it is sued is not its true name, nor had it ever been called by such, but that its true name is and always has been the Sovereign Camp of the Woodmen of the World. It therefore asks that the summons and declaration be quashed and the suit dismissed."

The plea of the general issue was accompanied, in the same pleading, with the following special pleas:

"For further plea the defendant says that John H. Mankin failed and refused to pay his monthly installment of assessment of dues, for the month of November, 1918, as required by the constitution and by-laws of the order, and by his failure to pay this installment of assessment for said month, he was suspended, and his beneficiary certificate, upon which this suit is based, be--

came null and void and of no further force or effect as per the terms of the constitution and by-laws of the order, which are parts and parcels of the contract of insurance.''

''For further plea the defendant says that at the time of the pretended reinstatement of the said John H. Mankin he, the said John H. Mankin was not in good health and he therefore could not be reinstated so as to bind the defendant, under the constitution and by-laws of the order, which constitution and by-laws are parts and parcels of the contract of insurance or certificate of insurance upon which this suit is based.''

These pleas were filed together under the provisions of section 2 of chapter 121 of the acts of 1897, which is as follows:

''Be it further enacted that a defendant can, in any suit, plead both in abatement, and in bar, at the same time, and that said plea in bar is no waiver of the plea in abatement, and when so pleaded, both pleas shall be heard at the same time and judgment rendered on each plea.''

After the filing of these pleas the plaintiff moved the court to be allowed to amend her declaration so as to make the name of the defendant read ''Sovereign Camp of the Woodmen of the World'' and this was allowed by the court, the order reciting that the declaration was so amended. No additional process was issued. Exceptions were taken by the defendant to this order. Subsequently the plea in abatement was stricken by the court, and to this action exception was taken. In three assignments of error the defendant attacks this action of the court.

In reply plaintiff insists that the filing of the plea in bar operated as a waiver of the plea in abatement; that although the defendant had a right to rely upon its plea in abatement even though it had filed a plea in bar, if it should be held here that the plea in abatement was properly stricken, the defendant having filed a plea in bar had put in a general appearance, and the plaintiff was entitled to have judgment on the merits. Under said chapter 121 of the acts of 1897 a plea in abatement and a plea to the merits may be filed at the same time. The latter does not overrule the former. The form of the verdict and judgment proper in such a case is indicated by the statute, that, is, both pleas shall be heard at the same time and judgment rendered on each plea. Railroad v. McCollum, 105 Tenn., 622, 59 S. W., 136; Sewell v. Tuthill, 112 Tenn., 271, 79 S. W., 376; Thach v. Continental Travelers' Mutual Accident Association, 114 Tenn., 271, 87 S. W., 255. In Railroad v. McCollum, supra, it was said that the spirit and intent of the act seems to be to do away with the former necessity of standing by pleas in abatement and succeeding or failing upon that defense alone in a single issue, and to give the parties the right to do

all their pleading at the same time if they wish. The language of our Supreme Court in the cases cited construing said act, is too broad and clear to warrant the adoption of the proposition insisted upon in behalf of the plaintiff. We are of the opinion that the filing of a plea in bar at the time of the filing of plea in abatement did not constitute a waiver of the plea in abatement, and that the defendant may still rely thereon.

We are of the opinion that the defect of misnomer was cured by the amendment giving the correct name of the defendant. Under section 3350a2 of Shannon's Code, chapter 121 of the Acts of 1897, the insurance commissioner was made an attorney in fact, upon whom process in this action against the defendant could be served. It was served upon the insurance commissioner as such attorney in fact, and the Sovereign Camp of the Woodmen of the World appeared by its attorney for the special purpose of pleading in abatement. The plea filed is a plea of misnomer giving the correct name of the defendant. Misnomer of parties is not a defect attended by grave consequence, by reason of the statutory provisions so generally prevailing under which the defect may be remedied by amendment. In England the effect of a misnomer of a defendant was altogether obviated by the statute of 3 and 4 William IV, chapter 42, whereby the plaintiff's declaration might be amended by inserting the true name of the defendant, and this is the general practice in the United States, amendments being allowed either in the writ or in the declaration. 14 Encly. of Pleading and Practice, 304, citing East Tennessee etc. Railroad Co. v. Mahoney, 89 Tenn., 311, 15 S. W., 652. The amendment is not for the purpose of changing the person, but merely of correcting the name of the same person or corporation. Our statutes, Shannon's Code, section 4583-4595 inclusive, provide a liberal policy as to amendments. Section 4583 provides:

"No summons, writ, pleading, process, return, or other proceeding in any civil action in any court, shall be abated or quashed, for any defect, omission or imperfection."

If the plea is a misnomer of the plaintiff or defendant, the plaintiff may amend by inserting the true name. Caruthers' History of a Lawsuit, 5th Ed., 169. Blue Grass Canning Co. v. Wardman, 103 Tenn., 179, 52 S. W., 137.

In Jones v. Miller, 1 Swan, 319, the warrant of the Justice of the Peace omitted the surname of the defendant. In the return and Justice's judgment the name was fully and perfectly stated, but it was not stated that the defendant appeared and made defense to the suit. In the circuit court the plaintiff entered a motion to amend the warrant in order to give the correct surname. The Supreme Court held that the motion to amend should have been allowed; that under

the aforesaid section 4583 an amendment may be made by inserting the correct name of the party which has been casually omitted, the power to amend judicial proceedings in order to attain the justice of the case being liberally construed and freely exercised.

In Smithson's Civil Procedure, page 474, the learned author and compiler sets forth this same conclusion as follows:

"Suppose that A B brings an action against a certain person, suing him by the name C·D; that the defendant pleads in abatement that his name is not C D but E F; and that the plaintiff then amends his summons and declaration by striking out the name C D and inserting the name E F. In such a case the amendment voids the plea; in other words, it cures the error or defect pointed out by the plea and cuts away the foundation on which it stood . . . Apparently, whenever the objection made by a plea in abatement is cured by amendment, the plea should be quashed; but the writer finds no direct authority on this question."

In our opinion these conclusions are correct. Upon plea of misnomer and amendment so as to give the correct name, the plea has lost its efficacy and must be stricken. If no other rights have intervened the amendment relates back to the date of the original summons. These are the only conclusions which we can logically reach. The fundamental rule of due process is not thereby violated, for the defendant, having been served with process, is finally brought before the court in its correct name. The defense of the statute of limitations is not involved in this action.

Under the contract between the deceased member John H. Mankin and the defendant society, his standing as a member and his rights became suspended on December 1, 1918 because of his failure to pay his assessment for the month of November. The provision governing this situation was self-executing. He could then re-instate himself and become restored to full membership within the first ten days of December, provided he were in good health at that time. On December 9th he paid to the clerk of the camp of which he was a member the amount of his assessment for the month of November. If he was in good health on that day he was fully re-instated and his beneficiary is entitled to the recovery upon the certificate. These propositions are undisputed, for they were agreed to by stipulation between counsel upon the trial. Under the assignments of error that there is no evidence to support the verdict and that the trial judge should have granted the defendant's motion to direct a verdict in its favor, the appellate court can only examine the evidence tending to support the verdict and disregard all countervailing evidence; and if there is substantial and material evidence, including all reasonable inference therefrom so tending to support the verdict, it will not be disturbed

The appellate court must take the strongest legitimate view of the favoring testimony, and under such view or construction of the evidence, in order to justify a reversal, it must appear that such evidence affords no support for the finding of the jury. But where the facts are controverted and of such a character that different minds might reasonably draw different conclusions therefrom, the issue is for the jury and its verdict will not be disturbed on appeal, the judgment not being reversible on other grounds. Moody v. Gulf Refining Co., 142 Tenn., 280, 218 S. W., 817. We must apply these tests in determining whether or not the evidence tends to show that John H. Mankin was in good health at the time of his reinstatement. He died on December 25, 1918 of blood poison after having been unconscious for about ten days. His physician Dr. Hayes pronounced the trouble as blood poison on December 16th. This was due to the carbuncle on the back of his neck. The first appearance of this trouble was on November 28th when a small pimple appeared. Dr. Hayes termed it carbuncle on December 4th. It was lanced by him on the 6th and 12th of December. Until December 16th neither his physician nor his wife had any impression that the trouble was due to blood poison. She testified that there was no indication of it until that day. Mrs. Mankin was asked and answered as follows:

Q. "Up until the 8th day of December was Mr. Mankin able to go about his business?

A. "Yes sir, he went into the house, going around killing hogs. I think he went on the first or second of December and helped make sausage, and all such as that, just called Dr. Hayes in when he happened to be down there.

Q. "He had a little place on his neck?

A. "Yes, and he wanted to see what it was.

Q. "If I understand you, you say Dr. Hayes told him he was not a sick man?

A. "Yes sir, he positively refused to come, saying he was not a sick man."

Charlie Mankin, a brother, testified that on December 6th the trouble on the neck was just a little pimple and that after that his brother was going about his business; that on December 16th he was there when the physician pronounced it blood poison, and he arranged to get an antitoxin. He further said that after the 6th his brother John H. Mankin was out riding a horse looking for his boys. Dr. Hayes, who died before this trial of the case, was reputed to be an excellent physician and surgeon. The witness, J. W. Green, a neighbor testified that Carl Mankin, a son of Charlie Mankin, who came home from the army on December 6th helped him, the witness to haul wood; that John H. Mankin came on horse back to the place

where they were cutting wood, for which purpose his own team was being used and his boys were rendering assistance; that although the witness did not remember the exact date, it was not likely that Carl Mankin helped him to haul wood the first day he came home from the army. From this the jury might reasonably infer that it was on some subsequent date. The witness further testified that on that day and a day or two later he saw John H. Mankin and did not notice anything the matter with him. The plaintiff Mrs. Mankin testified that up to December 9th her husband was just complaining of a little hurting on the back of his neck, due to a boil; that Dr. Hayes pronounced it a carbuncle on December 4th; that until December 16th Dr. Hayes told her husband that he was not a sick man.

The defendant introduced Dr. E. C. Lindsey who qualified as an expert having practiced medicine for thirty years. His opinion testimony was in response to hypothetical questions. He testified that a carbuncle is a gangrenous inflamation of the tissues under the skin, called the decaying tissues, usually with marked constitutional disturbances, which is really a disease; that a constitutional disease is one that affects the whole system; and that a carbuncle is a result of weakened condition or constitutional debility which might result from a number of causes such as diabetes, or a number of different urinal diseases. He said that a carbuncle is likely to be followed by blood poison or septicaemia. He was asked and answered as follows:

Q. "I want you to state what would be the condition of a man's health who had become sick in the latter part of November, 1918 and anywhere from the 25th to the 28th, and who had developed a carbuncle on or about the 2nd day of December, 1918, and in which blood poison sets up, or septicaemia twenty-three days before his death and him die on the 25th day of December, 1918, twenty-three days previous to that being December 2, 1918, if blood poison had set up on that day and carbuncle set up, I will ask you what was the state of his health?

A. "I regard the condition as very serious.

Again, he was asked this question in substance more elaborately, and he said that a man in that condition had been slowly absorbing poison all through that period and finally became thoroughly comatose as a result of his inability to throw it off. He said that the poison was being absorbed all the time from a breaking down of the gangrenous tissues underneath the skin. He was asked on cross-examination and answered as follows:

Q. "Doctor, if Mr. Mankin had a little pimple or a little boil on his neck and was going about his business with a little sticker on his neck and not complaining, except with his head sometimes, up and attending to his business, and all of that up

until the 8th or 9th of December, you would not say his health was materially impaired at that time would you?

A. "I do not believe Mr. Mankin or any man has ever had a carbuncle without being a very sick man."

He was further asked and answered as follows:

Q. "Doctor, Doctor Hayes in this case never saw this patient until the 4th day of December I believe, the proof shows on the 6th possibly, said he had a little boil, he took a lance and cut it. If it had been septicaemia, if this blood poison had been setting up at that time, the doctor would have known it?

A. "Not necessarily, the septicaemia works slowly. A man with willpower will keep on his feet when he is practically dead."

He was further asked and answered as follows:

Q. ":Doctor, what would the fact indicate to you as a physician and surgeon if this man was operated on on the 6th and again on the 12th of December, 1918, and that shortly thereafter that man became unconscious and died on the 25th of December, 1918, would that give you any idea as to his condition on December 2nd or December 4th when Dr. Hayes first visited him?

A. "I should think that the condition was that the man was gravely ill from the beginning and it may not have been realized, but he was a very sick man from the beginning."

This testimony of Dr. Lindsey was not disputed by the expert testimony of any other witness. While Dr. Hayes did not live to testify at this trial, his certificate signed and sworn to on February 4, 1919 as a part of the proofs of death, was introduced by the defendant. In this certificate he stated that the cause of death was septicaemia of a duration of twenty-eight days; that it was occasioned by a carbuncle on the neck. The proofs of death were of course furnished by the plaintiff Mrs. Mankin. It is insisted that the court erred in permitting her to introduce any testimony which would tend to contradict this affidavit of Dr. Hayes, the testimony being that septicaemia did not begin until December 16th; but this insistence will be dealt with later in the course of this opinion.

The trial judge charged the jury as follows:

"Good health means the applicant was not affected by any constitutional ailment of such character as to affect the general soundness and healthiness of his system seriously, and does not mean a mere temporary indisposition which does not tend to undermine and weaken the constitution. It is for you gentlemen to determine the question of fact as to whether or not he was in good health in the sense as I have just explained to you what good health means in the contemplation of this policy, and if you find that he was reinstated automatically she is entitled to recover, and if he was not, she cannot recover."

It is insisted that this instruction was erroneous because the evidence showed that carbuncle is a constitutional disease and accompanied with marked constitutional symptoms; that to charge the jury that good health means that the member was not affected with any constitutional ailment affecting the general soundness and healthiness of his system, was manifest error and gave the jury an opportunity to find in favor of the plaintiff. We do not see any error in this instruction, as it embodied a definition of good health which is universally approved, and especially by our Supreme Court in Chappell v. Metropolitan Life Insurance Company, 151 Tenn., 299, 269 S. W., 21; and Life & Casualty Insurance Co. v. King, 137 Tenn., 685, 195 S. W., 585. The phrase in question in these cases was, sound health, but the court held that they were practically synonymous. In Life Casualty Insurance Co. v. King, the court said:

"The term good health, when used in a policy of life insurance, means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness or healthfulness of the system. A mere temporary indisposition which does not tend to weaken or undermine the constitution, at the time of taking membership, does not render the policy void."

In Metropolitan Life Insurance Co. v. Chappell, the court said:

"The phrase, sound health, when used in the sense used in the policy under consideration, is not to be taken literally. It does not mean, perfect health, or imply absolute freedom from bodily infirmity or tendency to disease, but means generally the absence of any vice or disease in the constitution of a serious nature, or that has a direct tendency to shorten life, as distinguished from a temporary ailment or indisposition"—citing the leading case of Packard v. Metropolitan Life Insurance Co., 72 N. H., 1, 54 Atl., 287.

The instruction complained of simply embodied these definitions of good health, and left it to the jury, to determine the true status of the deceased member within said definition, that is, whether or not he had any constitutional ailment of such character as to affect seriously his general soundness and healthiness, as distinguished from a mere temporary indisposition which does not tend to undermine and weaken the constitution.

Taking the strongest legitimate view of the testimony tending to support the verdict, does it show the absence of any vice or disease in the constitution of the member of a serious nature, or that had a direct tendency to shorten life, as distinguished from a temporary ailment or indisposition? We have cited the testimony of Dr. Lindsey because it stands undisputed as expert testimony and otherwise,

except by the physical facts shown by Mrs. Mankin and Charlie Mankin, that John H. Mankin, on December 9, 1918, was attending to some ordinary duties, was not confined to his bed, and was at least apparently afflicted only with a small boil on his neck; and that Doctor Hayes did not pronounce it a case of blood poison until December 16th. We have considered the testimony of Dr. Lindsey under the rule that the appellate court will not permit testimony to be discarded or disregarded arbitrarily or capriciously; in other words, that it should not be utterly ignored. Frank v. Wright, 140 Tenn., 535, 205 S. W., 434. In the King and Chappel cases supra, the persons insured were afflicted with diseases necessarily fatal at the times when the policies were delivered to them. This case involves a different character of ailment. A carbuncle is not necessarily fatal. Persons afflicted with them very frequently recover completely. On December 9, 1918 John H. Mankin was afflicted with an ailment from which he might have recovered had not it made unusual inroads upon his system and developed into septicaemia. It might have been a mere temporary indisposition. There is evidence that he was not in a condition of septicaemia until about the 16th of December. The real test is whether or not his condition on December 9th was one having a tendency to shorten life or permanently impair health. Health is a relative term, for probably no one is altogether free from ailments. In Barnes v. Fidelity Mutual Life Association, 191 Pa., 618; 45 L. R. A., 264, it was held that a man who has a cold, on account of which he is in bed, may be nevertheless in good health within the meaning of a clause in a life insurance policy which requires the premium to be paid while he is in good health, although pneumonia sets in a day or two after the premium is paid, and proves fatal. The insured contracted an ordinary cold and died six days thereafter of pneumonia. The evidence tended to prove that pneumonia did not set in until the day after the premium was paid and the policy was delivered; yet one must conclude that the incipient cause was operating on the day of the delivery of the policy. In Horne v. John Hancock Mutual Life Insurance Co., 53 Pa., Supr. Ct., 330, it was held that whether the insured was in good health at the time of the delivery of the policy within the meaning of the provision that it should not become effective until actually delivered while the applicant was in good health, was a question for the jury, where the applicant died from pleurisy and congestion of the lungs, and the evidence was conflicting as to the condition of his health at the time of the delivery of the policy. The term, good health, was interpreted as meaning that the applicant has no grave, important, or serious disease; and is free from any ailment that seriously affects the general soundness and healthfulness of the system. In the Century Dictionary, the words, serious illness, are defined as, attended with dangers giving

rise to apprehension. In Peacock v. New York Life Insurance Co., 1 Bosw., 338, affirmed in 20 N. Y., 293, the court, in defining the warranty of good health, said:

"The most important question on applications for insurance is whether the proponent is exempt from any dangerous disease, one which frequently terminates fatally. It is not usually deemed an objection that one has some slight physical disturbance of which in all human probabilities he will soon be relieved, although it might possibly lead to a fatal disease. A slight difficulty such as the sting of a bee, the puncture of a thorn, a boil or a common cold, has sometimes induced complaints which have shortened human life; but this result is so infrequent and improbable that the mere possibility is disregarded in the business of life insurance." See notes to Maine Benefit Association v. Parks (81 Me., 79), 10 American St. Rep., 242.

The question is not what inference the court would draw from the facts proved, but whether the jury might reasonably determine the inference therefrom. The guiding principle for an appellate court is not what it may think the jury ought to have done, or what such court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such verdict from the evidence adduced. 4 C. J., 855.

The appellate court will not set aside the verdict where it is supported by inference reasonably deducible from the facts proved; or where the evidence is such as to leave the mind in doubt; or where the evidence supporting the verdict is even weak, vague or unsatisfactory. 4 C. J., 854.

In order to reverse the judgment in this case on account of the testimony of Dr. Lindsey, it would have to appear that this testimony was wholly uncontradicted, and was inconsistent with what testimony tends to support the verdict. We are unable to go so far as to reach such conclusion. After all it is opinion evidence, not based upon a personal knowledge of the person involved, of his physical temperament and constitution, especially his powers of resistence to disease. There is a difference in condition between having the seeds of disease and the disease itself. In the former condition the seeds of disease may be eliminated if it is such disease as is not necessarily fatal. Such was this case, although the disease resulted fatally. If Mankin had recovered from the carbuncle, as many people do, he could not be deemed not to have been in good health at the time of the attempted reinstatement. The testimony of Dr. Lindsey is not, in our opinion, so inconsistent with the testimony tending to support the verdict, that although apparently undisputed it would destroy all evidential value of the testimony. At least the question was one for the jury. The inference drawn while based upon rather weak and

not very satisfactory evidence, was one which it could reasonably draw, and therefore this court is bound by its finding.

It is insisted that the court erred in admitting testimony of Mrs. Mankin and Charlie Mankin contradictory of statements in the proof of death, which she had procured, adopted and agreed to as the basis for her claim for the amount provided in the certificate.

Mrs. Mankin in her affidavit stated that the cause of death was carbuncle followed by blood poison, the duration of the illness being three weeks and two days. Charlie Mankin stated that the cause of death was carbuncle or blood poison. We have already given the recitals made by Dr. Hayes. Our interpretation of the testimony objected to is that it is not really inconsistent with these recitals; that it tends by going into detail to explain the illness and the condition of John H. Mankin at the stage of illness existing on December 9, 1918. The plaintiff was compelled to furnish affidavits of the attending physician and some other person who knew the facts, especially because this testimony was explanatory rather than contradictory of the statements made in the affidavits. We are of the opinion that the admission of it did not constitute reversible error. The witnesses testified positively, freely admitted that the deceased had a carbuncle followed by blood poison which caused his death.

It is further insisted that the judgment is excessive because the trial judge reminded the jury that it should consider and determine whether or not the plaintiff was entitled to interest. The jury had not considered this question. The trial judge had correctly charged the jury that if they should find that the plaintiff was entitled to interest they might so state. The matter of interest was rather committed to the jury with full regard to their discretion, and after retiring they came in and reported that the plaintiff was entitled to interest on the principal sum of $1000. The court thereupon assessed the interest at $405, being the amount of interest from the date of institution of the suit to the date of the judgment. The finding by the jury was approved by the trial judge. If he delegated to the jury an authority which resided solely in him, he showed clearly what he would have done if he had acted upon the question alone. The allowance of interest was made one of the grounds of the motion for a new trial, and it was overruled. The assignment of error relating to this portion of the judgment is therefore overruled. All the other assignments of error are overruled and the judgment of the circuit court is affirmed. A judgment will be entered in this court in favor of plaintiff, Mrs. Jennie Mankin against the defendant Sovereign Camp of the Woodmen of the World, and the surety on its appeal bond, for $1405, with interest from the date of the judgment, July 21, 1926, and all costs of this cause.

Crownover, J., and Henderson, Special J., concur.