## LIFE & CASUALTY INS. CO. *v.* KING.

## (*Jackson,* April Term, 1917.)

1. **INSURANCE. Application as part of contract. Necessity of attaching.**

   Acts 1907, chapter 441, requires every policy of insurance issued by any company, except fraternal beneficiary associations and mutual insurance companies, to contain the entire contract of insurance. Chapter 457, passed on the same day, provides, in section 1, subd. 4, that all statements by insured shall, in the absence of fraud, be deemed representations and not warranties, and that no such statement shall avoid the policy unless contained in the written application, and that a copy of such application shall be indorsed upon or attached to the policy. Section 6 provides that that act shall not apply to industrial policies or to corporations or associations operating on the assessment or fraternal plan. *Held,* that as this last act relieves industrial insurance companies from the necessity of attaching their applications to their policies, and as the two statutes should be construed *in pari materia,* chapter 441 does not require the application to be attached to an industrial policy in order to make it a part thereof. (*Post, pp.* 695-697.)

   Acts cited and construed: Acts 1907, ch. 441.

2. **INSURANCE. Application as part of contract. "Industrial insurance."**

   A company which issued a policy providing for a weekly premium of twenty-five cents, maximum weekly allowances for sickness or accident of $5, and payment of $70 in case of death, was within the provision of Acts 1907, chapter 457, excepting industrial policies from the requirement that a copy of the application shall be indorsed upon or attached to the policy, since "industrial insurance" means small policies issued in consideration of weekly payments (quoting Words and Phrases, Second Series, Industrial Insurance). (*Post, pp.* 697, 698.)

Cases cited and approved: Bird v. State, 131 Tenn., 518; State v. Chadwick, 131 Tenn., 355.

Case cited and distinguished: Russell v. Insurance Co., 176 N. Y., 178.

3. INSURANCE. Conditions. Delivery while insured is in good health. Validity.

A condition of an insurance policy that the applicant must be alive and "in sound health" when the policy is delivered is not void for indefiniteness. (*Post, pp.* 698, 699.)

Cases cited and approved: Barnes v. Fid. Mut. Life Ass'n., 191 Pa. 618; Horne v. John Hancock Mut. L. Ins. Co., 53 Pa. Super. Ct., 330; Rand v. Life Assurance Society, 97 Tenn., 291; Insurance Co. v. Lauderdale, 94 Tenn.,, 635; Knights of Pythias v. Cogbill, 99 Tenn., 28; Eminent Household v. Prater, 24 Okla., 214.

4. INSURANCE. Conditions. Delivery while insured is in "good health." Construction.

The term "good health," as used in a provision of a policy re quiring insured to be in good health when the policy is deliv- ered, means that the applicant has no grave, important, or serious disease, and is free from any ailment that seriously affects the general soundness or healthfulness of the system, and a mere temporary indisposition which does not tend to weaken or undermine the constitution does not render the policy void. (*Post, pp.* 698, 699.)

5. INSURANCE. Life insurance. Risks covered.

A provision in an insurance policy that no benefits will be paid for sickness or death resulting directly or indirectly from dis- eases contracted or injuries received before the delivery of the policy is valid. (*Post, pp.* 699, 700.)

6. INSURANCE. Avoidance of policy. Misrepresentation as to health.

Where an application for life insurance contained a declaration that the answers therein were were strictly correct and truthful, and an agreement that, if any misrepresentation or fraudulent or untrue answers had been made, the agreement should be null

and void, and the policy contained a similar provision, and further provided that the applicant must be alive and in sound health when the policy was delivered, and that no benefits would be paid for sickness or death resulting, directly or indirectly from diseases contracted or injuries received before the delivery of the policy, and it appeared that insured had Hodgkin's disease, from which he subsequently died, when examined by the agent and when the policy was issued, that he knew he had such disease and had been operated on therefor, but that he failed to give this information to the company in his application, and falsely represented that he had consulted a doctor only for indigestion, the policy was void. (*Post, pp.* 700, 701.)

7. INSURANCE. Estoppel to urge forfeiture. Knowledge of facts.

As a general rule, where an insurer at the time of the issuance of a policy has knowledge of existing facts, which if insisted upon would invalidate the contract from its inception, such knowledge constitutes a waiver of conditions in the contract inconsistent with such facts, and the insurer is estopped thereafter from asserting the breach of such conditions. (*Post, pp.* 701, 702.)

Cases cited and approved: Wisotzkey v. Niagara F. Ins. Co., 112 App. Div. 599; McCarty v. Piedmont Mutual Ins. Co., 81 S. C., 152; Fosmark v. Equitable F. Ass'n., 23 S. D., 102; Irwin v. Westchester F. Ins. Co., 58 Misc. Rep., 441; Fludd v. Equitable L. Assurance Soc., 75 S. C., 315.

Cases cited and distinguished: Damms v. Humboldt Fire Ins. Co., 18 Ann. Cas., 687; Gurnett v. Atlas Mut. L. Ins. Co., 124 Iowa, 547.

8. INSURANCE. Estoppel to urge forfeiture. Knowledge of soliciting agent.

The general rule applies where the agent soliciting the insurance knows of the existing facts, such knowledge being imputable to the insurer. (*Post, pp.* 701, 702.)

9. **INSURANCE.** Estoppel to urge forfeiture. Facts putting on inquiry.

Where an insurance company, when a policy is issued, has information which, if pursued with reasonable diligence, would lead to a discovery of the true state of facts regarding the health of insured or other matter existing at the time upon which it is sought to base a forfeiture of the insurance or a defense, it is estopped to assert such forfeiture or such defense. (*Post, pp.* 702, 703.)

Cases cited and approved: North British, etc., Co. v. Steiger, 124 Ill., 81; Gandy v. Orient Ins. Co., 52 S. C. 224; Morrison v. Wis. Odd Fellows Mut. L. Ins. Co., 59 Wis., 166; Porter v. Ins. Co. of N. A., 29 Pa. Super. Ct., 75.

10. **INSURANCE.** Estoppel to urge forfeiture. "Wen."

At the time application was made for life insurance, insured was suffering from Hodgkin's disease, from which he subsequently died, and which manifested itself by swelling in the neck, and insured told the soliciting agent that none of the companies seemed to want to take him on account of the knot in his neck. It did not appear that he had ever been rejected by any company or that he so told the agent. The agent not being a medical man, and not having any true conception of the meaning of the small knot, supposed it to be and reported it to the company as a "wen," which is an indolent encysted tumor of the skin, especially a sebaceous cyst. *Held*, that there was nothing sufficiently definite in the information given the agent to put the company on inquiry, and it was not estopped to insist upon a forfeiture. (*Post, pp.* 703, 704.)

---

FROM SHELBY.

---

Appeal from the Circuit Court of Shelby County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court. —A. B. PITTMAN, Judge.

BARTON & BARTON, for plaintiff.

Jos. NORVILLE, for defendant.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

On the 23d of March, 1914, the plaintiff issued to Walter King a policy providing for a weekly premium of twenty-five cents, a maximum weekly allowance for sickness or accident of $5, and the amount of $70 payable in the event of his death. He died on February 25, 1915, and the present action was shortly thereafter brought to recover the $70.

Both sides moved for peremptory instructions, and the trial court overruled that of the plaintiff in error, and granted that of the defendant, in error, the wife of the deceased, to whom the policy was payable in case of death. The case was then appealed to the court of civil appeals, where the judgment was reversed, and the cause remanded for new trial. Both sides have brought the case to this court on petitions for writs of *certiorari*.

The application for the policy was taken by the company's agent C. G. Floyd, and the answers reduced to writing by him. In this paper King made reply to the following questions, as now stated:

"Are you in good health? A. Yes. Q. When last sick? A. January, 1914. Q. Of what disease? A. Indigestion. Q. Name and address of attending

137 Tenn.—44

physician? A. Dr. Beecham. Q. Did any insurance company ever decline your application? A. No."

There was appended to this application the following statement, signed by Walter King:

"I do hereby declare that the foregoing answers are strictly correct and truthful, in which there is no suppression of any facts; and I acknowledge and agree that this statement shall form the basis of the agreement with the company, and if any misrepresentation or fraudulent, or untrue answers have been made, or any omission or neglect to pay any premiums, on or before the day on which they shall fall due, shall take place, that then this agreement shall become null and void, and I shall not be entitled to any benefits or privileges under said agreement, and all moneys which shall have been paid shall be forfeited to the said company for its sole use and benefit; and I do further agree that if any policy shall be issued, to conform to its requirements."

The policy also contained the following stipulation:

"If the representations of the application on which this policy is granted be not true, or if the conditions of this policy be not in all respects observed, or if any erasure or alteration shall be made in this policy except by indorsements signed by the proper officers, this policy shall thereupon become void; and whenever for any cause this policy shall terminate or become void, all premiums previously paid shall be for-

feited to the company unless otherwise provided herein.''

On the back of the policy the following conditions appear:

''(4) The applicant must be alive and in sound health when this policy is delivered, and no liability is assumed by the company prior to the date hereof, nor unless on said date and delivery of this policy the first payment has been legally made. . . .

''(6) No benefits will be paid for sickness or death resulting, directly or indirectly, from diseases contracted or injuries received before the delivery of this policy; nor will any benefits be paid for sick-ness or death resulting, directly or indirectly, from intemperance, immorality, or venereal diseases.''

It was agreed at the bar of the court that the record showed that the deceased died of ''Hodgkin's disease.'' This is shown to be a disease of the glands of the body, that it is slow in its progress, but almost uniformly fatal. The evidence shows that the insured had been afflicted with this disease for two years prior to his death. Dr. Beecham treated him in February, 1914, and it was giving him a good deal of trouble at that time. This was just about one month prior to the time he made his application, and less than two months before the date the policy was issued. Prior to this time, and during the year 1913, he had been operated on at the city hospital for a swelling in his neck caused by this disease. Dr. Beecham told him, in February, 1914, that he con-

sidered that his trouble was "Hodgkin's disease."
At the time his application was taken by Mr. Floyd,
the company's agent, there was what is called in the
record "a knot on the side of his neck," which was
observable.  The agent's attention was attracted to
it, and he asked Walter King about it.  According to
the agent's testimony, King said that it gave him no
trouble; but the agent reported to his company, at
the foot of the application, in response to a printed
question whether the applicant had any physical or
mental defect, that there was a small wen on his
neck.  The disease which he had did not interfere
with his work until some five or six weeks before his
death, as he continued to work at a sawmill up to the
time he was taken down and was sent to the hospi-
tal.  He continued at his usual work, after he recov-
ered from the operation for the "knot on his neck"
in 1913, up to the time he was sent to the hospital
in 1915.

On the second examination of Tankie King, the de-
fendant in error, she testified that the application
was taken on Sunday morning, at the home of the
insured; that the "knot on the neck" of the insured
was spoken about in the presence of the agent; that
the agent had been urging the insured to take the poli-
cy for two or three months; that the insured said
none of the companies "seemed to want to take him
on account of the knot on his neck;" that the insured
asked the agent if he had a doctor to examine his

patients, and the latter replied that his company did not have doctors any longer, and added: "If your neck happens to bother you, let us know and we will have a doctor to you to examine it."

The witness Floyd testified that no one was present at the time the application was taken but the insured and himself; that it was not at the home of the insured but at the mill where he was working; that nothing was said about his having been in the hospital; that he saw no scar on the neck of the insured, and he had no scar; that the insured told him nothing about having been treated for "Hodgkin's disease."

This disease is more particularly described than has already been stated by one of the medical witnesses as follows:

"It is an enlargement of all the glands of the body through progressive anemia. Usually the disease continues some time before it produces death, but occasionally there are very acute cases in which persons die in two or three months. It is like tuberculosis; some die right away and some live eight or ten years. A man might suffer with this disease without knowing that he was afflicted with a fatal disease. He would not necessarily have to be in bed, but would be going around yet ailing. It usually grows in intensity, but it is variable in all cases. The disease usually comes by swelling. The disease usually comes, first, you notice a little enlargement

of the glands of the neck. It can be localized in any gland of the body—swelling of the glands. It wouldn't be very much for three or four years; just stay in these glands; then gradually go down; in back of this bone—the inguinal glands would enlarge and affect the lymphatic system. Then there can be an acute type through all the glands being enlarged at the same time, and then it might be what you call localized and stay in one region a long time before it spreads to the rest of them."

The medical witness further testified that from the time the first symptoms would manifest themselves up to the time of death the patient would not ordinarily be disabled; that a man suffering from the disease, however, would know that he had a chronic disease of some description, from the first symptom, that is the enlargement of the gland. The witness then corrected himself by saying that the patient might not know that the disease was chronic; that all he would know was that the gland was enlarged, but would not know that it would remain; that some people might not even know that it was abnormal; that this would depend on the intelligence of the patient. The witness testified that, from the symptoms the insured exhibited when he came to the hospital shortly before his death, he had been affected with the disease for about two years.

The agent who took the application was not only a soliciting agent, but also cashier of the company.

The trial judge ruled that the application was no part of the contract of insurance, and declined to enforce it.  He also declined to enforce so much of section 4 as required that the insured should be in sound health on delivery of the policy, on the ground that this clause was too indefinite, and also because the agent who took the application saw the knot on the neck of the insured.  He also declined to enforce section 6 because it was unreasonable so far as it applied, directly or indirectly, to diseases contracted or injuries received before the delivery of the policy. He thereupon, as already stated, peremptorily instructed the jury in favor of the defendant in error here, plaintiff below.

We are of the opinion that the trial judge and the court of civil appeals erred in holding that the application was not a part of the policy.  It is urged in support of the conclusion reached in the lower courts that chapter 441 of the Acts of 1907 necessitates such a result.  That act provides:

"That every policy of insurance issued to or for the benefit of any citizen or resident of this State on or after the first day of July, 1907, by any insurance company or association doing business in this State, except fraternal beneficiary associations and mutual insurance companies or associations operating on the assessment plan, shall contain the entire contract of insurance between the parties to said contract, and every such contract so issued shall be

held as made in this State, and construed solely according to the laws of this State.''

Standing alone, this act would cover the point adequately, and would fully sustain the conclusion reached in the two lower courts. However, this act must be construed *in pari materia* with chapter 457 of the Acts of the same year, which was passed on the same day by the legislature. That act is entitled:

''An act establishing standard provisions and conditions to be contained in policies of life insurance issued by companies organized under the laws of this State and companies licensed to do business in this State.''

This act begins:

''That no policy of life insurance shall be issued in this State or be issued by a life insurance company organized under the laws of this State ,unless the same shall contain the following provisions.''

Then follow thirteen provisions. All of these are subdivisions of the first section. The second section catalogues certain provisions that shall not appear in any policy. The third mentions certain permissive provisions; the fourth, a requirement as to the filing of the form of the policy in the office of the insurance commissioner; the fifth contains certain permissive provisions with respect to foreign companies.

The sixth section reads:

"That this act shall not apply to annuities, industrial policies, or to corporations or associations operating on the assessment or fraternal plan."

The fourth provision, under section 1, is a requirement "that all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and that no such statement shall void the policy unless it is contained in the written application, and a copy of such application shall be indorsed upon or attached to the policy when issued."

In volume 2 of Words and Phrases (2 Series), p. 1054, it is said:

"Industrial insurance means small policies issued in consideration of weekly payments in contradistinction to the ordinary insurance, where premiums are payable annually, semi-annually, or quarterly"—citing *Russell* v. *Insurance Co.,* 176 N. Y., 178, 68 N. E., 252, 253, 98 Am. St. Rep., 656.

The plaintiff in error, as will be seen from the description of its business contained in the first sentence of this opinion, falls directly within the definition. Therefore section 6, quoted *supra,* applies to it, and it is relieved of the duty of obeying subsection 4 of section 1 of chapter 457, also quoted *supra.* If the language of chapter 441 be held to cover industrial insurance policies, companies issuing such policies are required to incorporate the applications

within their policies, or cause them to be attached thereto, in order that they may be made a part thereof. This construction, however, would bring the act just mentioned in conflict with chapter 457, which evinces a clear purpose on the part of the legislature to relieve industrial insurance companies from the necessity of attaching their applications to their policies. The two acts having been passed on the same day, and on the same general subject, therefore, as stated, should be construed *in pari materia*, and this must result in reading the exception in favor of industrial companies contained in the second act into the first act, as was done in the case of *Bird* v. *State,* 131 Tenn., 518, 175 S. W|, 554, Ann. Cas., 1917A, 634, with respect to certain anti-liquor laws. This enables us to prevent any conflict between the two acts, and to enforce what was the evident purpose of the legislature, which it is the bounden duty of the court to accomplish. *State* v. *Chadwick,* 131 Tenn., 355, 174 S. W., 1144.

The next question we shall consider is the validity of the fourth condition on the back of the policy quoted *supra.* Is that condition void because of its generality? Certainly not. However, this conclusion is stated in view of the definition which the term "good health" bears in the authorities relating to this subject. The term "good health," when used in a policy of life insurance, means "that the applicant

has no grave, important, or serious disease, and is free from any ailment that seriously affects the general soundness or healthfulness of the system. A mere temporary indisposition, which does not tend to weaken or undermine the constitution, at the time of taking membership, does not render the policy void." Note to *Roe* v. *National Life Insurance Association*, 17 L. R. A. (N. S.), 1145; citing *Barnes* v. *Fidelity Mutual Life Association*, 191 Pa., 618, 43 Atl., 341, 45 L. R. A., 264, and other cases.

The same definition is found in note on page 173, L. R. A. (N. S.), 1916F, citing *Horne* v. *John Hancock Mutual L. Insurance Co.* (1913), 53 Pa. Super. Ct., 330. To the same effect, see 14.R. C. L., 900, 1068, 1071. Our own cases are substantially in accord. *Rand* v. *Life Assurance Society*, 97 Tenn., 291, 37 S. W., 7; *Insurance Co.* v. *Lauderdale*, 94 Tenn., 635, 30 S. W., 732; *Knights of Phythias* v. *Cogbill*, 99 Tenn., 28, 41 S. W., 340. See, also, *Eminent Household* v. *Prater*, 24 Okl., 214, 103 Pac., 558, 23 L. R. A. (N. S.), 917, 20 Ann. Cas, 287, and note 291 *et seq.*

That such clauses are valid there is abundant authority. 14 R. C. L., 900, 138 Am. St. Rep., 62, 43 L. R. A. (N. S.), 725, note.

We see no objection to the sixth provision. This is in the nature of a condition subsequent, and provides for the forfeiture of the insurance in case the

insured shall die of any disease contracted, or injury received, before the delivery of. the policy. Certainly this is a reasonable provision, and, if the parties to the contract were willing to make this term a part of it, there could be no objection to it in law or morals.

When the three points of the contract bearing on good health are taken together, it appears that in the application the insured was required to speak to the condition of his health at that time; in the fourth clause provision was made for a change in the condition of his health between the date of the application and the delivery of the policy; and in the sixth, a provision to protect the company as far as possible from fraud, it was declared that if the insured should die of any disease contracted, or injury inflicted, before the delivery of the policy nothing should be collectible thereon—in other words, that the policy should stand forfeited.

The evidence is uncontradicted that the insured was afflicted with "Hodgkin's disease" at the time he made his application, and continuously thereafter until his death, and that he died of that disease. It is also undisputed that he was informed by his physician, Dr. Beecham, within a month before he made his application, that he was affected with that disease.

It follows, from what has just been said, that the plaintiff in error, the insurance company, was entitled to a peremptory instruction unless there was

sufficient evidence of a waiver, or estoppel against it, to justify the sending of the case to the jury.

There is no evidence that the insurance company actually knew that he had this disease, but there is evidence that its agent saw the swelling on the neck of the insured, which was an ordinary indication of the disease, but, not being aware of its significance, he thought it was only a wen, and so informed his company at the foot of the application. It was testified by the defendant in error that her husband informed the agent that "none of the companies seemed to want him on account of this knot on his neck." The agent denied this statement, but the evidence was in the record, and we are to determine whether this raised a conflict in the evidence of a material character requiring a remand for submission of the case to another jury.

The general rule is well stated in 18 Ann. Cas., 687, in a note to *Damms* v. *Humboldt Fire Insurance Co.,* viz.:

"That where the insurer, at the time of the issuance of a policy of insurance, has knowledge of existing facts which, if insisted upon, would invalidate the contract from its very inception, such knowledge constitutes a waiver of conditions in the contract inconsistent with the known facts, and the insurer is estopped thereafter from asserting the breach of such conditions"—citing *Gurnett* v. *Atlas Mutual Insurance Co.,* 124 Iowa, 547, 100 N. W, 542; *Wisotzkey* v. *Niagara F. Insurance Co.,* 112 App. Div., 599,

98 N. Y. Supp., 760; *Id.,* 189 N. Y., 532, 82 N. E.,
1134; *McCarty* v. *Piedmont Mutual Insurance Co.,*
81 S C., 152, 62 S. E., 1, 18 L. R. A. (N. S., 729;
*Fosmark* v. *Equitable F. Association,* 23 S. D., 102,
120 N. W., 777. .

It is held that the same rule applies where the
agent soliciting the insurance knows of the existing
facts, and such knowledge is imputable to the insur-
er. *Irwin* v. *Westchester F. Ins. Co.,* 58 Misc. Rep.,
441, 109 N. Y. Supp., 612; *Id.,* 133 App. Div., 920,
118 N. Y. Supp., 1115; *Fludd* v. *Equitable L. Assur-
ance Society,* 75 S. C., 315, 55 S. E., 762; 14 R. C. L.,
p. 1159, section 340.

The reason of the rule is stated in the same note
in a quotation from *Gurnett* v. *Atlas Mutual L. In-
surance Co., supra,* thus:

"The law is charitable enough to assume, in the
absence of any showing to the contrary, that an in-
surance company intends to execute a valid contract
in return for the premium received; and when the
policy contains a condition which renders it void at
its inception, and this result is known to the insurer,
it will be presumed to have intended to waive the
condition, and to execute a binding contract, rather
than to have deceived the insured into thinking his
property is insured when it is not, and to have taken
his money without consideration."

The question remains, however, whether a waiver
or estoppel arises where the insurance company has
information at the time which, if pursued with rea-

sonable diligence, would lead to a discovery of the true state of facts regarding the health of the insured, or other matter existing at the time upon which it is sought to base a forfeiture of the insurance, or a defense rested on some clause of the policy.

We are of the opinion that, in such case, there is an estoppel. *North British, etc., Co.* v. *Steiger,* 124 Ill., 81, 16 N. E., 95; *Gandy* v. *Orient Ins. Co.,* 52 S. C., 224, 29 S. E., 655; Morrison v. Wisconsin Odd *Fellows Mutual L. Ins. Co.,* 59 Wis., 166, 18 N. W., 13; *Porter* v. *Ins. Co. of North America,* 29 Pa. Super. Ct., 75. See, also, as to the effect of knowledge or notice to officers or agents of the company, 25 Cyc., 862 to 865.

But we are of the opinion that there was nothing sufficiently definite in the information which Tankie King says her husband gave the agent, even if true, to put the company on inquiry, since it does not appear therefrom that Walter King had ever offered himself to any company for insurance and been rejected. Nor is there any evidence in the record that he had ever applied for insurance and been rejected. And while the knot on King's neck attracted the agent's attention, he supposed it to be only a wen, which is defined to be, "An indolent encysted tumor of the skin," especially "a sebaceous cyst," something far different from the malignant swelling which indicates "Hodgkin's disease;" and he so reported his impression to the company, viz., that King

had a wen on his neck. We are further of the opinion that on such report the company would not reasonably attach any importance to the swelling; and, further, that the agent, not being a medical man, and not therefore having any true conception of the meaning of the small knot on the neck, was not at fault in failing to correctly interpret to the company the swelling he had observed. So we are of the opinion that the conflict between the testimony of the agent and that of the widow Tankie King, on the point referred to, was unimportant, and hence not sufficient to justify sending the case to the jury. Furthermore, we are of the opinion that, since it appears that Walter King had ''Hodgkin's disease'' when he was examined by the agent, and when the policy was issued, and that he died of it, and that he knew he had that disease, and furthermore that his neck had been operated on for it, and that he failed to give this information to the company in his application, but falsely represented that he had consulted a doctor only for indigestion, the company was entitled to a peremptory instruction in its favor, and that the trial court committed error in declining to give that instruction, and in instructing for the plaintiff below, and that the court of civil appeals committed error in not reversing the trial court for the error just mentioned. We therefore hold that doing here what should have been done below, the plaintiff's suit must be dismissed, with costs.