AMERICAN NATIONAL INS. CO. v. ROBERT L. TAYLOR.

Eastern Section. February 14, 1930.

Petition for Certiorari denied by Supreme Court, June 10, 1930.

Cate, Smith, Tate & Long, and W. W. Piper, all of Knoxville, for plaintiff in error.

W. H. Eagle and Joel H. Anderson, both of Knoxville, for defendant in error.

THOMPSON, J.  The plaintiff below, Robert L. Taylor, was the beneficiary of an industrial life insurance policy, which the defendant below, American National Insurance Company, issued on the life of plaintiff's wife, Sallie Taylor, on January 30, 1928.  The said Sallie Taylor died on June 7, 1928.  Defendant declined to pay and plaintiff sued.

The case was tried in the Circuit Court by the court without the intervention of a jury and resulted in a judgment in favor of the plaintiff for the face of the policy, $408.30, and interest, $22.50—a total recovery of $430.80.  The defendant's motion for new trial having been overruled, it has appealed to this court and has assigned errors.

The date of the application was January 9, 1928.  It contained the following:

"I hereby apply for insurance for the amount herein stated, and I declare and warrant that the answers to the above questions are complete, correct and true to the best of my knowledge and belief. I agree that said answers with this declaration shall form the basis of a contract of insurance between me and the American National Insurance Company, and that any policy which may be granted in pursuance of this application shall be accepted subject to the terms, conditions and agreements in said policy.  I expressly waive on behalf of myself and of any person who shall have or claim any interest in any policy issued hereunder, all provisions of law forbidding any physician from disclosing any information acquired while attending me in a professional capacity.  I further agree that *no obligation shall exist against said company on account of this application,* although I may have deposited premiums hereon, unless said Company shall issue a policy in pursuance hereof, and the same is delivered to me on the day it bears date, and *unless on said date I am alive and in good health,* any statement of any agent to the contrary notwithstanding."  (Italicizing ours.)

The policy, as stated, was issued and was delivered on January 30, 1928.  The insuring clause was as follows:

"American National Insurance Company in consideration of the payment in advance of the premium mentioned in the schedule below on or before each Monday during the continuance of this con-

tract, does hereby agree, subject to the agreements and conditions below and on the reverse hereof, each of which is herein recited, to pay, immediately upon receipt of due proof of the death of the Insured made in the manner, to the extent and upon the blanks required herein, and upon surrender to the Home Office of this Policy and all Receipt Books, the amount stipulated in said schedule. Provided, however, that *no obligation is assumed by the company* prior to the date hereof, nor *unless on said date the Insured is alive and in sound health."* (Italicizing ours.)

Agreements and conditions numbers five and seven of the policy were as follows:

"Fifth—This Policy is void if any Policy on the life of the Insured has been issued by the Company, and is in force at the date hereof, unless this Policy contains an endorsement, signed by the President or Secretary, that such prior Policy may be in force. The Company shall not be presumed or held to know of the existence of any previous Policy, and in such case the issue of this Policy shall not be deemed a waiver of this condition; or if any of the representations upon which this Policy is issued are not correct; or if the said weekly premium is not paid according to the terms of this contract. If for any cause this Policy becomes void, all premiums paid hereon will be forfeited to the Company, except as the privileges and concessions herein provided.

"Seventh—This Policy is issued upon an application which omits the warranty usually contained in applications, and contains the entire agreement between the Company and the Insured and the holder and owner hereof. All statements made by the Insured in the application herefor shall, in the absence of fraud, be deemed representations and not warranties. Its terms cannot be changed or conditions varied, except by a written agreement, signed by the President, or Secretary. Therefore Agents (which term includes Superintendents and Assistant Superintendent) are not authorized and have no power to make, alter or discharge contracts, waive forfeitures, or receive premiums on Policies in arrears more than four weeks, or to receipt for same in the Receipt Book, and all such arrears given to an Agent shall be at the risk of those who pay them, and shall not be credited upon the Policy, whether entered in the Receipt Book or not."

The application was not attached to the policy and was not copied into it in any way. But since the premium was only 30-cents per week and the amount of the policy was only a little over $400, we think that it was an industrial policy and that it is not material that the said application was not attached to the policy or copied into it. But the question as to what effect untrue answers in the

application have upon the beneficiary's right to recover under the policy is not simple.

The above quoted statement in the application which was on one of the defendant's printed forms was that "I declare and warrant that the answers to the above questions are complete, correct and true to the best of my knowledge and belief;" and "I agree that said answers with this declaration shall form the basis of a contract of insurance between me and the American National Insurance Company," etc. But the insuring clause of the policy, unlike most insuring clauses, does not recite that "in consideration of the application," etc. And agreement or condition number seven of the policy is: "This Policy is issued upon an application which omits the warranty usually contained in applications, and contains the entire agreement between the Company and the Insured and the holder and owner hereof. All statements by the Insured in the application herefor shall, in the absence of fraud, be deemed representations and not warranties." Agreement or condition No. 5 of the policy was jumbled. The intention may have been to say that the policy would be void if any of the representations upon which it was issued were not correct, but that is not what was in fact said. Said agreement or condition No. 5 comes nearer saying that the Company shall not be presumed or held to know if any of the representations upon which the policy was issued were not correct.

The first sentence in agreement or condition No. 7, i. e., "This Policy is issued upon an application which omits the warranty usually contained in applications, and contains the entire agreement between the Company and the Insured and the holder and owner hereof," necessarily means that the application cannot be looked to. Insurance Company v. King, 137 Tenn., 695, 696. But the next sentence, i. e., "all statements made by the Insured in the application herefor shall, in the absence of fraud, be deemed representations and not warranties," indicates that the draftsman thought that the application could be looked to notwithstanding the previous sentence. We think that the first sentence is controlling and that the application cannot be looked to to avoid the policy. Therefore, the fact that in the application the insured, Sallie Taylor, answered that she had suffered from no illness or disease during the past three years, when in fact she had within the past three years been confined to her bed and treated by physicians for several months at two different times for pellagra, does not void the policy. We might add, however, that the trial court may have concluded (and correctly) that said Sallie Taylor did not intend to actually deceive or defraud the company because the evidence indicates clearly that at the time she made the application she though that she had been entirely cured.

But the provision on the front of the policy that "no obligation is assumed by the Company prior to the date hereof, nor unless on said date the Insured is alive and in sound health," is valid, and if on January 30, 1928, said Sallie Taylor had a grave, important and serious disease which seriously affected the general soundness or healthfulness of her system or tended to undermine and weaken her constitution there can be no recovery. The defendant insists that the uncontradicted proof shows that on said date she had pellagra and that pellagra is such a disease.

The plaintiff and his wife (the insured) Sallie Taylor, lived in Knoxville. They had five children who lived with them. Plaintiff's mother lived about two blocks from them.

During the two or three years prior to January 9, 1928, plaintiff's mother had a policy with the defendant company, and the plaintiff had one with it on his youngest child, but the plaintiff's other policies, i. e., the ones on himself, his wife and four of his children were in another company, i. e., the Metropolitan Life Insurance Company. It seems that some of the local representatives of the defendant company sent plaintiff word several times that if he would take his insurance with the defendant company it would give him better indemnity than the Metropolitan was giving him. So, plaintiff let his policies with that Company lapse, and sent word to a Mr. Johnson, one of the agents of the defendant Company at Knoxville to go to his home and take the applications. Mr. Johnson went to plaintiff's home on January 9, 1928, and took the application of plaintiff's wife for the policy involved in this suit. Whether Johnson also took the application for the other policies, or if so just when he took them, does not appear, but seven policies (including the one involved in this suit) were issued by the defendant company on the plaintiff and members of his family on January 30, 1928.

When Johnson took the application of plaintiff's wife for the policy now involved, he asked her questions and filled out the application form himself. There is no insistence that he did not write down the answers just as she gave them to him. Question No. 13-A was as follows: "From what illness or diseases have you suffered during the past three years? State them all, giving date of each. If none, so state. To this question she answered and he wrote "No," meaning, of course, "none." Question No. 13-B was as follows: "If you suffered any illness referred to in 13-A, was recovery in each instance complete? To this question she answered and he wrote "No," meaning, of course, that she had suffered no illness.

During the spring and summer of 1926, the insured, Sallie Taylor, was sick with pellagra. Dr. Foster, a physician of Knoxville, treated her from May 31, 1926, to July 16, 1926, and told her that she had pellagra. She improved very much and practically all of the

symptoms or manifestations of pellagra disappeared. During the spring of 1927, the symptoms and manifestations of pellagra broke out again and she became bed ridden with it. She was extremely exhausted and her arms, face and neck were broken out, i. e., were in a "state of eruption," as the physician expressed it. She was bed ridden for two months, and was treated by Dr. Roberts of Knoxville, and was told by him that she had pellagra. His treatments were from May 26, 1927, until sometime in August, 1927, and during this time a public health nurse went to her home regularly and gave her treatments. She improved very much and during the fall of 1927, her manifestations of pellagra disappeared again.

During the spring of 1928, here symptoms and manifestations of pellagra appeared again, and during March and April, 1928, Dr. Roberts again treated her. She was very ill and was confined to her bed in her home. This time her condition was worse than ever before and her mind became affected, and she did not respond to treatment. So, during May, 1928, she was put in the Knoxville General Hospital. Her condition, both physical and mental, continued to get worse, and she died on June 7, 1928, in said hospital. Her mind was practically gone for several weeks before she died. A day or two before she died she developed pneumonia. In a sense she died of pneumonia, but the pellagra was the real cause of her death. As Dr. Watkins expressed it, no one ever dies of pellagra or tuberculosis because those kinds of patients always just before they die develop something else which takes them away. But undoubtedly the pellagra caused the death of the insured, Sallie Taylor.

The evidence of the physicians who testified shows that although the medical science has learned how to treat pellagra with fair success, yet that very little is known about it and its cause. It is supposed to be caused from bad nutrition and is more prevalent in the lower classes who are not able to afford a properly balanced diet, and the treatment consists of both dieting and the administration of medicine. It is known as a major disease and more often proves fatal than curable. The symptoms and manifestations of it appear in the spring as the sun begins to shine brightly and hotly. The patient then breaks out with an eruption and generally becomes bed ridden for a month or two. In the late summer or early fall the symptoms and manifestations disappear and the patient is apt to think that he has recovered. But the next spring the symptoms and manifestations appear again—generally worse than the year before. When the symptoms and manifestations disappear in the late summer or early fall it is impossible for the physicians to know whether they will appear again the next spring, because patients sometimes recover. If the symptoms and manifestations do not reappear in the spring for a year or two, or for a few years, the patient can,

with fair safety, be regarded as cured. But the fact that the symptoms and manifestations disappear during any late summer or early fall does not really indicate that the patient has recovered.

As a rule a physician to whom a pellagra patient is brought for treatment cannot determine from an examination how long the patient has had it, but the disease seems to have three stages or degrees—known in medical science as the "3 D's"—the third "D," meaning dementia.

There is some evidence in the record indicating that the insured, Sallie Taylor, had pellagra a year before the spring of 1926, but whether she did or not, she certainly had it during said spring and early summer. But she was not confined to her bed. She went to Dr. Foster's office for treatment that spring and summer. But the next spring and summer (1927) the manifestations were much worse. She was broken out and bed ridden for about two months. And the next spring (1928) the manifestations were still worse—her mind being affected—and she died on June 7, 1928. It is clear, therefore, that her disease progressed and that she was never at any time cured. So, she must have had pellagra on January 30, 1928, when the policy was issued and delivered. And it is equally clear that pellagra is a major disease, so grave, important and serious as to affect the general soundness or healthfulness of the system and to weaken and undermine the constitution.

We are therefore of the opinion that under the following sentence of the insuring clause of the policy sued upon, i. e., that "no obligation is assumed by the Company priod to the date hereof, nor unless on said date the Insured is alive and in sound health," there can be no recovery in this case. Insurance Company v. King, 137 Tenn., 689.

But the plaintiff insists that the record shows that Johnson, the agent of defendant who took the application, knew at the time he took said application, that Sallie Taylor had pellagra. We have considered this contention and are of the opinion that there is no material evidence that Johnson had such knowledge.

Prior to January 9, 1928, when Johnson took the application, he may have collected some weekly premiums at plaintiff's home on the policy which plaintiff had with the defendant company on the life of his youngest child. But plaintiff testified that on January 9, 1928, he had had said policy for four years, and he spoke of it as a "paid up" policy. So, it may have been that Johnson had not been collecting on said policy at plaintiff's home for a year or so before he took the application. It may also have been that prior to January 9, 1928, Johnson had collected weekly premiums at the home of plaintiff's mother on her policy. But plaintiff's mother lived two blocks or more from plaintiff. We think that the evidence

tending to show that Johnson made any of said premium collections is vague and shadowy. In fact, the evidence indicates rather clearly that another agent of the company, a Mr. Cook, made the most, if not all, of said collections. And Cook was not shown to have still been with the company in January, 1928. Certainly he had nothing to do with the taking of said application or with the issuance of the policy.

We might state in conclusion that we think that whatever equitable considerations may be applied to a law case are on the side of the defendant. It is true that the plaintiff testified that he had six policies with the Metropolitan Life Insurance Company, one of which was on the life of his wife, Sallie Taylor, and that because the defendant sent him word that it would give him better indemnity, etc., he let these policies lapse and took policies with the defendant company. Now it may have been that had he not let the Metropolitan's policy lapse on Sallie Taylor he could have recovered on it. But for all the record shows the defendant's policies may have been more liberal than the Metropolitan's, and the defendant was not shown to have acted unfairly with the plaintiff in any respect.

But we do not believe that there was an insurance company in business that would have issued a policy on the life of Sallie Taylor in January, 1928, if it had known that she had been confined to her bed for two months or more with pellagra during the spring and summer of 1927, and had been treated for pellagra for two months during the spring and summer of 1926. And although Sallie Taylor may have thought that she was cured and may not have been guilty of an actual fraudulent intent in answering that she had not suffered from any illness or disease during the past three years, etc., nevertheless, her untrue answers induced the defendant to issue a policy on her life which it would not have issued had she answered truthfully. In other words, she was not an insurable risk and her untrue answers got insurance for her.

For the foregoing reasons we think the judgment of the trial court in favor of the plaintiff should be reversed and that plaintiff's suit should be dismissed at his cost, including the costs of the appeal. An order will therefore be entered accordingly.

Reversed and remanded.

Portrum and Snodgrass, JJ., concur.