## GEORGE ROBERT SCOTT v. NATIONAL LIFE & ACCIDENT INSURANCE COMPANY.

Middle Section. January 14, 1933.

Petition for Certiorari denied by Supreme Court, March 18, 1933.

Hardin H. Conn, of Springfield, for plaintiff in error.
Charles Willett, of Springfield, for defendant in error.

FAW, P. J. According to the usual practice, this case should be styled National Life & Accident Insurance Company v. George Robert Scott, as the Insurance Company, the defendant below, is the plaintiff in error here; but, in order to avoid confusion as to its identity, we have styled the case in the caption hereof as it appears on our dockets.

However, for convenience of statement, we will refer to George Robert Scott as plaintiff and National Life & Accident Insurance Company as defendant.

This is an action on a policy of industrial insurance for $410, on the life of Mrs. Cecil Blackwell who died on December 23, 1931.

The policy in suit was issued by defendant Insurance Company on March 24, 1930, and the beneficiary named in the policy when issued was Bud Blackwell, the husband of the insured, but, at the request of the insured, George R. Scott, the plaintiff here, was subsequently substituted as beneficiary.

This action was begun before a Justice of the Peace of Robertson County on March 15, 1932, and was taken, by appeal from his judgment, to the Circuit Court of Robertson County, where it was tried before the Circuit Judge, without the intervention of a jury, and the Court found the matters in controversy in favor of the plaintiff Scott and against the defendant Insurance Company and rendered judgment against defendant and in favor of plaintiff for $410, with interest thereon from March 15, 1932, amounting to $7.17, making the full sum of $417.17, and also for all the costs of the cause.

Defendant Insurance Company moved for a new trial on grounds set out on the record, but its motion was overruled, and defendant thereupon appealed in error to this Court and has assigned errors here.

In view of assignments of error complaining of the action of the trial court in overruling defendant's motion in arrest of judgment, it will be observed that the record discloses no motion in arrest of judgment which could be considered by the trial court. A paragraph in the minute entry immediately following the overrulement of the motion for a new trial recites that the defendant "made a motion in arrest of judgment for the same reasons and on the same grounds set out in the motion for a new trial, and which motion, after due consideration, the Court is pleased to and doth overrule the same."

The motion for a new trial in this case is based upon the evidence, and a motion in arrest of judgment "can only be maintained for a defect upon the face of the record, and the evidence is no part of the record for this purpose." Assurance Co. v. Feed & Grocery Co., 122 Tenn., 652, 655, 126 S. W., 1085; Mosley v. Orr & Co., 6 Tenn. App., 243, 245; Highland Coal & Lumber Co. v. Cravens, 8 Tenn. App., 419, 426.

One of the terms of the policy contract reads as follows: "No obligation is assumed by the Company prior to the date hereof, nor unless on said date the Insured is alive and in sound health. Should the proposed Insured not be alive or not be in sound health on the

date hereof, any amount paid to the Company as premiums hereon shall be returned.''

One of the defenses interposed by the Insurance Company was, and is, that the policy never became effective, and obligatory upon the defendant, for the reason that the Insured was not ''in sound health'' at the date of the policy.

Defendant tendered to plaintiff $23.95, the amount paid to the Company as premiums on said policy, with interest thereon, but plaintiff declined to accept same, and defendant thereupon paid said sum into the Registry of the Court as a continuing tender.

The Insurance Company sought to defend upon the further ground that the written application upon which the policy was issued contained serious and material misrepresentations with respect to the health and previous medical history of the insured.

The foregoing defenses were, in substance, embodied in a written plea filed by the defendant in the Circuit Court, and the record shows that, in response thereto, the attorney for plaintiff said: ''Our answer to the defendant's plea is (if it requires an answer) that a frank disclosure was made to the soliciting agent of the Insurance Company not only as to the condition of this woman's health but her previous confinement in the hospital.''

By agreement the affidavit of Dr. Alfred Calhoun, Jr., was read at the trial below as the sworn testimony of said witness and as competent testimony on behalf of defendant, which affidavit (omitting the testimonium clause and the jurat) is as follows:

''Dr. J. Alfred Calhoun, Jr., Physician, Medical Out-Patient Department, Vanderbilt University Hospital, Nashville, Tennessee, first being duly sworn, says:

''That Mrs. Cecil Blackwell, a resident of Robertson County, Tennessee, was a patient of Vanderbilt University Hospital from September 19, 1929, to December 5, 1929, suffering from:

''(1) Chronic Rheumatic Cardiac Valvular Disease, Mitral Stenosis, Aortic Insufficiency.

''(2) Cardiac Hypertrophy.

''(3) Cardiac Insufficiency.

''(4) Hydrothorax (Right).

''(5) Ascites.

''(6) Syphilis.

''and was treated in the wards of the hospital during this period by various cardiac and antileuetic drugs. She was readmitted on December 23, 1929, and remained until January 12, 1930. The diagnoses were:

''(1) Chronic Rheumatic Cardiac Valvular Disease, Mitral Stenosis, Aortic Insufficiency.

"(2) Cardiac Hypertrophy.

"(3) Cardiac Insufficiency.

"(6) Syphilis.

"In addition, acute rhinitis.

"She again received treatment in the same manner. She was again treated in the Out-Patient Department on July 30, 1930, and her condition was fairly satisfactory. She was again admitted on May 25, 1931, and remained in the hospital until June 6, 1931, and the diagnoses were:

"(1) Chronic Rheumatic Cardiac Valvular Disease, Mitral Stenosis, Aortic Insufficiency.

"(3) Cardiac Insufficiency.

"(6) Syphilis.

"(2) Cardiac Hypertrophy.

"She was discharged showing some improvement. She was last seen at the hospital on July 6, 1931."

The nature, character, and relative gravity or seriousness of the several ailments listed in the foregoing testimony of Dr. Calhoun are explained by the testimony of Dr. J. S. Hawkins, of Springfield (a graduate physician of twenty-two years experience), as follows:

"Q. I will ask you to examine the affidavit of Dr. J. Alfred Calhoun, Jr., given under date of June 18, 1932, and which is part of the record in this case, in order that I may ask you some questions pertaining to the diseases described therein. (Witness examines affidavit.)

"Q. First I want to ask you the meaning of the words 'Chronic Rheumatic Valvular Disease?' A. Just simply a disease of the valve of the heart and that rheumatism had produced it.

"Q. What is the meaning of the words 'Mitral Stenosis?' A. A narrowing of the mitral valve in the heart.

"Q. What is the meaning of the words 'Aortic Insufficiency?' A. Aortic Insufficiency means regurgitation of the blood as it passes from the heart out into the aorta.

"Q. State whether or not that disease described in these terms is the same disease that you found the patient suffering from about eight years ago when you examined her in Cedar Hill? A. As to the Aortic Insufficiency—that's what I diagnosed it. The disease was what they call a double heart lesion of two different valves—I suppose I didn't recognize the mitral stenosis.

"Q. What is the meaning of that word 'mitral stenosis?' A. The mitral valve is a passage or opening. The blood goes from the left auricle into the left ventricle. Stenosis means the closing of that opening.

"Q. I will ask you to state whether or not that disease de-

scribed there as No. 1 on that sheet of paper is of an organic nature? A. It is.

"Q. Is it permanent or temporary? A. It is permanent.

"Q. State whether or not it is of a serious nature? A. It is. Of course any chronic heart disease is a serious condition. However, they can live a long time with the proper care of themselves.

"Q. I ask you to refer to the disease listed as No. 2: 'cardiac hypertrophy?' A. That usually occurs with a valvular disease, when the heart is trying to take care of it. The heart becomes enlarged trying to take care of the blood that is not carried out through the system.

"Q. Is it possible for a patient to recover from that disease? A. No. That is what you call a chronic condition.

"Q. Now, then, Doctor, I will ask you to refer to the disease listed as No. 3. What is that? A. Cardiac Insufficiency. That means the heart becomes diseased on account of some other disease so that it cannot perform its duties.

"Q. Is that a serious, organic trouble? A. Yes.

"Q. Any hope or cure for that disease? A. Not that I know of.

"Q. The next one listed as No. 4, what does that mean? A. Hydrothorax. That is an accumulation of fluid in the thoracic cavity.

"Q. What produces that condition? A. A good many things. Anything that interferes with the venous circulation. Any of these heart troubles. It is a lung condition. It would be a good many to name. Any disease that would interfere with the venous circulation.

"Q. State whether or not that is of a serious nature? A. They can if they could get rid of the thing that is causing it. You can draw the fluid off, but you have to get rid of what is causing it.

"Q. What is the disease listed as No. 5? A. Ascites. That is an accumulation of fluid in the abdominal cavity. Dropsy.

"Q. The layman's term is dropsy? A. Yes.

"Q. What produces that condition with a patient. A. It might come up from a disease of the heart, or the liver, or the kidney.

"By the Court: If the person had a heart disease you would attribute it to that? A. Yes.

"Q. I will ask you whether or not dropsy, or ascites, is caused from other things than heart disease? A. Yes.

"Q. State whether or not dropsy might be caused from a condition of the kidneys? A. Yes.

"Q. And from the liver? A. Yes.

"Q. So the mere fact that a patient has dropsy does not mean or indicate that that patient has heart disease? A. Not necessarily.

"Q. And it doesn't necessarily mean that the dropsy was caused from heart disease? A. No.

"Q. Now, the next disease in the first group: No. 6? A. Syphilis.

"Q. I will ask you to state whether or not that is an infectious disease of the blood system? A. It is. It is considered a venereal disease.

"Q. State whether or not that is a disease of a serious nature? A. It is.

"Q. Is it a permanent or temporary disease? A. If it is treated and treated regularly there is hope of them getting well. It is owing to how advanced it is before they do begin to take the treatment.

"Q. State how that disease, syphilis, might manifest itself on different parts of the body other than in a venereal nature. A. It can affect any organ in the body, your lung, heart, brain and nervous system. You have skin rashes with it. Syphilis affects every portion of your body.

"Q. I ask you to state whether or not these diseases which you have referred to and described for us in layman's terms are serious in their nature such as to very seriously impair the health of anyone suffering from any of them? A. Yes.

"Q. I will ask you to state whether or not a patient suffering from these diseases on September 19, 1929, was in sound health? A. No. People have some of these things—People can have syphilis and not know it. Perhaps some of us here have some heart condition and do not realize it and would not realize it unless they were examined.

"Q. I believe, however, that Mrs. Blackwell was having symptoms of that nature which caused her to consult you as a physician prior to September 19, 1929, was she not? A. She was.

"Q. These diseases listed in groups 2 and 3 I believe are exactly as those in the first list with the exception of one in grade No. 2 which says, 'In addition, acute rhinitis.' A. That is what we would speak of as a 'bad cold.'

"Q. I will ask you to state whether or not a patient suffering with any of these diseases or with all of these diseases would, at the time of such illness, be in good or sound health? A. They would not.

"Q. I will ask you to state whether or not a patient suffering from these diseases, which I believe you describe as serious or-

ganic troubles, would be able to recover and be in sound health? A. No. They would never be in sound health.

"Q. Then as I understand you, Doctor, from analysis of these various diseases, if this patient, Mrs. Cecil Blackwell, was suffering from these diseases in September, 1929, December, 1929, up until January 12, 1930, she could not have been in sound health on March 24, 1930, is that true? A. That's true."

It clearly appears from the record, without contradiction, that the insured, Mrs. Cecil Blackwell, was not in sound health at the date of the policy involved in this suit; and unless the Insurance Company, through its agent, waived the requirement that the insured, as a condition precedent to the operation of the policy, be in sound health at its date, the plaintiff is not entitled to recover. Life & Casualty Insurance Co. v. King, 137 Tenn., 685, 698-699, 195 S. W., 585; Metropolitan Life Insurance Co. v. Chappell, 151 Tenn., 299, 307, 269 S. W., 21; Hayes v. Commonwealth Life Insurance Co., 8 Tenn. App., 554; American National Insurance Co. v. Taylor, 13 Tenn. App., 134.

In the case now before us, the insured signed an application pursuant to which the policy in question was issued by defendant company, which application contained, among others, the following questions and answers:

"18. Are you in good health? A. Yes.

"19. Are you deaf? A. No.

"20. Do you use intoxicating liquors, morphine, or other narcotics to excess? No.

"21. Are you deformed? No.

"22. Have you any eye trouble? No.

"23. Have you ever had heart disease, asthma, tuberculosis, cancer, ulcers, diabetes, fits, hernia, kidney disease, lumbago, syphilis, paralysis, rheumatism, sciatica, vertigo, or any illness or disorder of the brain, lungs, spine or nervous system, or any disease not common to both sexes; or suffered the total or partial loss of a hand, foot, eye, or the use thereof? No.

"24. What medical or surgical attention have you had in the last five years? Diagnosis: Bad colds. Date, Year and Mo.: 1929-1.

"Duration Weeks: 1. Doctor: Moore.

"24½. Have you ever been in a hospital for treatment? Yes. "If so, what for? Sprained ankle."

The above questions were printed and the answers were written by N. W. Worsham, the defendant's agent who solicited and procured the application, and, after Worsham had filled in the answers,

the application was signed by Mrs. Blackwell, to whom the policy was subsequently issued and delivered.

Bud Blackwell, the husband of the insured, and Jake Bolton, the son-in-law of Bud Blackwell, testified; as witnesses for plaintiff, that they were present when said application was solicited and filled up by Worsham and signed by Mrs. Blackwell.

Bud Blackwell states that Mrs. Blackwell told Worsham that "she didn't guess they would write it because she had been in the hospital for dropsy and heart trouble," and that Worsham replied that "it looked like she was in good health then and he would write it if she would let him."

On cross-examination, Bud Blackwell testified with reference to Mrs. Blackwell's statements to Worsham, as follows:

"Q. You say your wife told Mr. Worsham that she had been in the hospital at Nashville for eleven weeks? A. Yes, sir.

"Q. You say she told him that she was there in the hospital on account of dropsy? A. Heart trouble or dropsy or something to that effect.

"Q. Now didn't she say dropsy? A. I don't recollect for certain—heart trouble or dropsy.

"Q. You mean you don't remember what she said? A. I think she said heart trouble. . . .

"Q. Now, Mr. Blackwell, when this agent, Worsham, asked your wife if she had been in the hospital for treatment you say she told him she had been there for eleven weeks? A. Yes.

"Q. Did she tell him when? A. I don't know whether she did or not.

"Q. Did she tell him when within the last eight or ten years? A. Yes.

"Q. When did she tell him? A. I couldn't tell you but I know it was less than that.

"Q. Why do you say that? A. A she hadn't been sick that long.

"Q. What information did she give the agent—that's what I want to know? A. I don't remember.

"Q. Did she tell him she was in the hospital with a sprained ankle? A. No, sir.

"Q. You wouldn't swear that she didn't tell him she was in the hospital with a sprained ankle? A. She might have, yes, sir.

"Q. You do remember some conversation about a sprained ankle, don't you? A. Yes, sir. She had a sprained ankle.

"Q. And there was some conversation about the ankle being sprained? A. I don't remember whether him and her had any talk about it or not.

## "RE-EXAMINATION.

"By Mr. Willett: Q. You say that she might have told him something about a sprained ankle in connection with the hospital? A. Yes, sir.

"Q. When the hospital at Nashville was mentioned by the agent, what did she tell him she had been in that hospital for? A. For heart trouble.

"Q. Anything else? A. I don't know whether she said anything about a sprained ankle or not. I believe she did. Everybody thought that was the cause of the foot and legs swelling.

"Q. What was the cause? A. The sprained ankle.

"Q. What did she tell him she went to the hospital for? A. Dropsy, I think.

"Q. Who was present and heard that conversation? A. Jack Bolton and his wife.

"Q. They lived out there by you at that time? A. Yes.

## "RE-CROSS EXAMINATION.

"By. Mr. Conn: Q. And you say she told him she went to the hospital for dropsy? A. I think so."

Bud Blackwell also states that at the time the application was signed by his wife, and at the time the policy was delivered to her, she was "up and working;" that she was "washing, ironing, and doing other work."

Jake Bolton was asked and answered as follows:

"Q. Without my leading you and suggesting what to say, go ahead and tell what was said by the agent and Mrs Blackwell. A. He come in there to get the insurance and she told him, 'I don't guess it will be any use writing it out because I've been in the hospital for eleven weeks for the dropsy.' And he said, 'It don't make any difference. I will write it and if you get it it is all right and if you don't it is all right.'

"Q. And after that time did he bring the policy and hand the policy to her? A. Yes, sir.

"Q. You made your home there with them? A. Yes, sir."

On cross-examination, Jake Bolton testified further as follows:

"Q. Then you were present during the entire conversation between Mr. Worsham and Mrs. Blackwell? A. Yes.

"Q. You heard everything that was said? A. Yes.

"Q. And after he had asked the questions and filled it out you saw her sign her name there? A. Yes, sir, I think she did.

"Q. You saw the application taken? A. Yes, sir.

"Q. I show you here the application filed in this case as a part of the record and that is the application and her name you

spoke of? (Mr. Conn exhibits application to witness.) A. I reckon it is.

"Q. You say she told the agent, Mr. Worsham, she had been in the hospital for eleven weeks for dropsy. That's all she told him about any disease? A. Yes, sir, dropsy.

"Q. It is the only disease that was mentioned? A. I think so.

"Q. You were present? A. Yes.

"Q. You are sure about what was said? A. Yes. . . .

"Q. In that conversation between Mrs. Blackwell and the agent, Worsham, what did she say about a sprained ankle? A. Nothing.

"Q. It wasn't mentioned? A. No, sir, not that I know of.

"Q. And you were present from the time he started talking until he left? A. Yes, sir.

"Q. And neither he nor Mrs. Blackwell mentioned sprained angle one way or the other? A. No, sir. . . .

"Q. And dropsy is the only thing she told the agent about? A. Yes, sir, the only thing she told the agent about."

N. W. Worsham, defendant's agent who obtained said application from Mrs. Blackwell, was not called as a witness for either party. It does not appear from the record that he was employed by the defendant or was available as a witness at the time of the trial of this case in the Circuit Court. The only evidence on this subject is in the testimony of Bud Blackwell, and is as follows:

"Q. Where is this agent of the defendant Insurance Company at the present time? A. Where is he living?

"Q. Yes. A. At Greenbrier he told me.

"Q. Here in Robertson County? A. Yes.

"Q. Where is he living now? A. I don't know.

"Q. When did you last see him? A. Not in two or three months.

"Q. You don't know whether he lives in this County or not? A. No, sir.

"Q. At the time this case was tried in the Court below, before Esq. Draughon, where did he live then? A. At Greenbrier.

"Q. Was he called as a witness for the defendant then? A. I don't know.

"Q. Did he testify in the case? A. No, sir, he did not.

"Q. Who was Mr. N. W. Worsham—what was he? A. Sir?

"Q. Was he the soliciting agent for the defendant Company? A. Yes, sir, that's what he said he was.

"Q. Did he himself deliver the policy to your wife? A. Yes, sir.

"Q. Thereafter did he, the said N. W. Worsham, collect the

premiums on it? A. He collected the premiums all the time up until my wife's death."

It is evident that the insured, Mrs. Blackwell, was practically an illiterate woman, but she could write her name, and there is no evidence that she was lacking in ordinary intelligence. She signed her name to the application, and her statement to Worsham that she "didn't guess" the Insurance Company would write a policy on her life because she had been in the hospital for dropsy shows that she had at least a fair comprehension of the requirements with respect to the health of applicants for life insurance.

The proof shows, as before stated, that Worsham wrote the answers to the questions in the application, but the insured signed the application, in which it is stated that the answers were written opposite the respective questions in accordance with her directions. There is no evidence that she was unaware of the statements in her application, and, in the absence of proof to the contrary, it must be presumed that she knew the contents of the instrument she signed. 8 Couch on Insurance, sec 2171, p. 7027.

Where the Insurance Company's agent has knowledge of the true condition of the insured, such knowledge of the agent is imputable to the Company; but "where insured consciously permits an application containing material misrepresentations to be presented by subordinate agents to officers of insurer under circumstances which he knows negative any probability that the actual facts will be revealed, and later accepts a policy which he must know was issued in reliance upon the statements, he cannot recover on the policy, and this rule is not altered by the fact that a statute designates as agents of insurer all persons acting directly or indirectly in its behalf in making the contract or causing it to be made, since such statute does not raise special agents with limited authority into general ones possessing unlimited powers." 37 C. J., p. 530.

To same effect, see 4 Couch on Insurance, sec. 842q, p. 2774, and Id., sec. 890a, p. 3050.

In such case, the insured is a party to the fraud, and will not be permitted to take advantage of his own wrong. Hayes v. Commonwealth Insurance Company, supra, p. 558.

It results that the trial court erred in finding the issues for plaintiff and in rendering judgment in his favor and in overruling defendant's motion for a new trial. The judgment of the trial court is therefore reversed and set aside, and judgment will be entered here dismissing plaintiff's suit. The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff George Robert Scott.

Crownover and DeWitt, JJ., concur.